UNITED STATES of America, Appellee,

v.

Burl Gene MARET, Appellant.

No. 19925.

United States Court of Appeals, Eighth Circuit.

Oct. 26, 1970.

Rehearing Denied and Rehearing En Banc Denied Dec. 12, 1970.

Thomas W. Flynn, Jr., Clayton, Mo., for appellant.

James M. Gordon, Asst. U. S. Atty., St. Louis, Mo., for appellee; Daniel Bartlett, Jr., U. S. Atty., on the brief.

Before MEHAFFY and LAY, Circuit Judges, and HARPER, Chief District Judge.

MEHAFFY, Circuit Judge.

Burl Gene Maret was convicted by trial to a jury of assaulting Robert J. Caton, a superintendent of mails, in the St. Louis Post Office on July 20, 1966 with intent to rob, steal or purloin mail matter, money and other property in the custody and control of Caton, and in attempting to effect such robbery by putting the life of Caton in jeopardy with the use of a loaded gun in violation of 18 U.S.C. § 2114. Maret was sentenced to the mandatory term of twenty-five years' imprisonment. We affirm the judgment of conviction.

Maret had originally pleaded guilty to the offense, but was allowed to withdraw his former plea and stand trial after it was determined in a post-conviction proceeding that his plea was not voluntary by reason of a misunderstanding with his then attorney as to the mandatory nature of the penalty.

Defendant bases this appeal on three assignments of error. He asserts:

(1) That the court erred in denial of his motion for an independent psychiatric examination to determine his mental competency at the time of the alleged commission of the offense and his competency to stand trial;

(2) The insufficiency of the evidence as to his intent to rob and the denial of a motion for verdict at the conclusion of the evidence; and

(3) The admission of testimony of defendant's statements without having advised him of his legal rights.

About 1:30 a. m. on July 20, 1966, defendant went to the second floor of the main St. Louis Post Office. When the elevator door opened a custodial post office employee who was waiting for the elevator was confronted by defendant armed with a small automatic pistol. Defendant first demanded to see the provost marshal, and then upon the employee's suggestion was led to Room 278 where the employee's supervisor was located. As they proceeded to the supervisor's office, defendant fired one shot from his pistol down one of the corridors.

Caton, who was working as foreman of mails in Room 278, had supervision of all persons, equipment and property in this outgoing mail room including some fourteen revolvers to be issued to postal clerks assigned to convoy registered mail. While defendant was walking towards Caton's mail room, Caton was in the process of issuing a Colt .38 caliber revolver to substitute clerk Clyde Cassaday. When defendant and the custodial employee walked into Caton's office, defendant had his gun pressed to the employee's neck and told Caton to

call the FBI. At this time defendant said in effect that the FBI wanted him and he was there to rob the place. Defendant then turned to Cassaday, who had received the revolver and completed the loading of it, took the revolver out of Cassaday's holster and ordered the other employees in the room to lay down on the floor. Defendant fired five bullets from the government revolver across the room.

Two postal investigative aids, who heard the shots, armed themselves and proceeded down the corridor to Room 278. When defendant came in their view they ordered him to drop his gun, whereupon defendant surrendered. After searching defendant for weapons and removing a small pocket knife, the investigative officers took defendant to their office. One of them immediately attempted to advise defendant of his constitutional rights, but defendant constantly interrupted him with profanity and statements that "I know my rights." In spite of this, one of the investigative aids read to defendant his rights from a form of warning then employed by postal inspectors. This warning advised defendant of his right to remain silent, that anything he might say could be used against him in court, that he had a right to talk to a lawyer for advice before any questions were asked and to have him present during questioning, and if he could not afford a lawyer one would be appointed for him. Some five minutes after this, the St. Louis police arrived, the group being in the charge of Lieutenant Harper. Harper asked defendant his name, but defendant declined to answer, whereupon he was placed under arrest. Then Harper began to recite to defendant his constitutional rights and defendant again interrupted with profanity and said, "I just came here to rob the post office." When the St. Louis police took defendant into custody he claimed that he was suffering from narcotics withdrawal. He was sent to a hospital where an examination proved negative.

*The Psychiatric Examination.*

A few days after commission of the offense, defendant was, upon motion of the United States Attorney, ordered to the Medical Center for Federal Prisoners at Springfield, Missouri to be examined to determine his competency to stand trial. Defendant was admitted to the Medical Center on August 3, 1966, and on October 11, 1966 the report of the three doctors who examined defendant was issued, stating that it was the consensus of the staff that defendant was ready for a competency hearing and that their findings supported an adjudication of competency.

After defendant had been allowed to withdraw his plea of guilty, his counsel filed a motion for another psychiatric examination. In response to this motion, Judge Meredith ordered an examination at the Medical Center to include determination of his competency at the time of the criminal offense alleged in the indictment. On May 28, 1969 the Neuropsychiatric Staff reaffirmed the diagnosis made in 1966 that defendant was a "sociopathic personality" and their findings supported an adjudication of competency. Thereafter on September 2, 1969, defendant renewed his motion for appointment of a psychiatrist other than a government employee, which was denied by Judge Meredith. On neither of defendant's motions was the trial court presented with any statement of facts to justify a third psychiatric examination by an independent source and at government expense. Nor was there any suggestion that defendant intended to enter a plea of not guilty by reason of insanity. Judge Meredith, of course, knew that defendant had been examined twice before at the Medical Center, one examination being conducted a few days after the offense was committed and the other shortly before the trial, but in both cases the defendant was pronounced a "sociopathic personality" with no signs of psychosis or thought disorder.

■■ Some degree of mental illness does not equate with legal incompetence.

Butler v. United States, 384 F.2d 522, 523 (8th Cir. 1967), cert. denied, 391 U.S. 952, 88 S.Ct. 1854, 20 L.Ed.2d 865 (1968). When the report does not indicate a state of present insanity or mental incompetence, the trial court is not required to take any other action prior to trial.

■ The purpose of an 18 U.S.C. § 4244 psychiatric examination is only to establish defendant's competency to stand trial. Shale v. United States, 388 F.2d 616, 618 (5th Cir. 1968), cert. denied, 393 U.S. 984, 89 S.Ct. 456, 21 L.Ed. 2d 445 (1968). The question of mental competency at the time of trial is for the trial judge and not for the jury. United States v. Huff, 409 F.2d 1225, 1228 (5th Cir. 1969), cert. denied, 396 U.S. 857, 90 S.Ct. 123, 24 L.Ed.2d 108 (1969). But once the defendant offers evidence of his insanity, the burden of proving legal sanity is on the government. United States v. Albright, 388 F. 2d 719, 724 (4th Cir. 1968); Beltran v. United States, 302 F.2d 48, 52 (1st Cir. 1962), citing Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895). Repeated mental examinations are not required under the statute and the trial court's determination is not to be set aside unless "clearly arbitrary and unwarranted." Hall v. United States, 410 F.2d 653, 658 (4th Cir. 1969), cert. denied, 396 U.S. 970, 90 S.Ct. 455, 24 L.Ed.2d 436 (1969). Unless the circumstances are such from the medical reports received or other facts presented, it would seem premature for the trial court at a pretrial date before it has actual knowledge that the defense of insanity will be interposed to order any mental examination dealing with defendant's insanity as of the date of the commission of the crime. The statute does not authorize such procedure and we are convinced that it would have done so if Congress had deemed it advisable.

■■ Whether an additional psychiatrist should be appointed in a particular case is within the sole discretion of the trial court. Ruud v. United States, 347

F.2d 321 (9th Cir. 1965), cert. denied, 382 U.S. 1014, 86 S.Ct. 624, 15 L.Ed.2d 528 (1966). The trial court here had nothing before it but the evidence of defendant's competency, and did not abuse its discretion in denying a third examination by an independent psychiatrist of defendant's choice at government expense. To permit such a practice would enable a defendant to sit by and condone an order for examination at the government hospital and then if the report did not suit him to demand another examination at government expense. The law does not require this, and for us to so hold would be an invitation for every defendant to demand such a procedure without furnishing the trial court with any compelling reason therefor. Defendant here made no objection to the qualifications of the psychiatrists at the Medical Center. He did not suggest or offer insanity as a defense and at trial offered no testimony whatsoever in defense of the charge. Under the existing circumstances, it cannot be said that the trial court abused its discretion.

It was not intended originally to discuss our recent opinion in United States v. Schultz, 431 F.2d 907 (8th Cir. 1970), as in my view the case at bar and *Schultz* are patently distinguishable. The dissent however is bottomed on the conclusion reached in *Schultz* and the author expresses difficulty in distinguishing the two cases. It is unnecessary to discuss all the many distinguishing features in the two cases. It will suffice to point out that in *Schultz* the defendant did in fact apprise the court of his intention to plead insanity at trial and did in fact interpose the defense of insanity at the trial. Maret did neither. Maret's counsel had very good reason for not doing so. He had access to and read both psychiatric reports and wisely, we think, sought to convince the jury that the government failed to prove the necessary intent in view of the fact that the only government property that Maret took was a revolver and he already had one of his own when he entered the Post Office.

If the defense of insanity at the time of the commission of the crime had been interposed in *Maret,* it could well have focused the jury's attention on such issue and defendant, or any independent psychiatrist, would have been hard put to explain away statements made by him upon the examinations which served to form the basis of the medical conclusion. For example, Maret asserted to the government psychiatrist that he had been taking narcotics prior to and at the time of the offense. A physical examination failed to reveal any puncture wound and when Maret attempted to demonstrate how he injected himself he did not have the slightest notion of how to perform such an injection and finally admitted that he could not and had only taken some pills. It will be recalled that he made the same statement upon his arrest in the Post Office building and he was promptly turned over to medical men whose report indicated the falsity of Maret's statement. Additionally, Maret told the government psychiatrist, "I will always be a crook. When I get caught, I know I'll have three meals a day. I plan to do this (steal and get caught) all my life." Even a layman with benefit of the existing psychiatric reports would be convinced that the defense of insanity could not possibly prevail and the best results could be obtained by not opening up this subject at trial, which was the tactic Maret's counsel proceeded to utilize. So it is that the instant case cannot be analogized with *Schultz.*

There is still another reason why we think Maret's contention on this issue is specious, and that is that the Criminal Justice Act was never intended to provide examinations for a determination of sanity in pretrial procedures where the trial court is not furnished any legitimate reason for such an examination. No such reason was even tendered here. 18 U.S.C. § 3006A(e) is designed to give an indigent defendant at government expense the benefit of investigation and expert and other services necessary for an adequate defense. And on the question of insanity, this could and

should be afforded only in proper cases and only after a legitimate defense of insanity has been at least indicated. This can well be done by recessing the trial after the case is commenced as was the case in Pope v. United States, 372 F.2d 710 (8th Cir. 1967), vacated on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968). There must be an end to technical delays in the trial of criminal cases if our system is to survive. The writer had reservations that *Schultz* might be utilized in future cases for technical and delaying purposes, and for that reason stressed in a concurring opinion the broad discretion vested in a trial court in such matters.

Judge Bright in the majority opinion in *Schultz* concludes with the following observation:

"Though this record convincingly establishes that Schultz committed the acts forming the basis of the indictment, *this record also discloses that he had an inadequate opportunity to defend on the issue of insanity.*" (431 F.2d at 912) (Emphasis supplied.)

In this case, defendant was deprived of nothing to which he was entitled. He had two mental examinations, one shortly after the crime and one a few years later shortly before the trial, and we have no doubt that if defendant had pleaded insanity and there was any question in the trial court's mind, it would have afforded a third examination even after commencement of the trial.

The situation calls to mind the classic language found in the late Mr. Justice Frankfurter's dissenting opinion in Stewart v. United States, 366 U.S. 1, 11, 81 S.Ct. 941, 949, 6 L.Ed.2d 84 (1961), in which he stated:

" 'To turn a criminal appeal into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.' Johnson v. United States, 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (concurring opinion)."

Mr. Justice Frankfurter further observed:

"More than a half-century ago, William H. Taft, reflecting his wide experience even before he became Chief Justice, laid this charge at the door of the courts:

" '* * * The * * * disposition on the part of the courts to think that every provision of every rule of law in favor of the defendant is one to be strictly enforced, and even widened in its effect in the interest of the liberty of the citizen, has led courts of appeal to a degree of refinement in upholding technicalities in favor of defendants, and in reversing convictions that render one who has had practical knowledge of the trial of criminal cases most impatient.

" '* * * When a court of highest authority in this country thus interposes a bare technicality between a defendant and his just conviction, it is not too much to charge some of the laxity in our administration of the criminal law to a proneness on the part of courts of last resort to find error and to reverse judgments of conviction.' " Taft, The Administration of Criminal Law, 15 Yale L.J. 1, 15 (1905). 366 U.S. at 21, 81 S.Ct. at 954.

The thought of reversing this case is abusive to common sense. Here, defendant had been granted two psychiatric examinations. The learned trial judge had a much better opportunity to determine the necessity for any additional examination than we could possibly have from a cold record. Reversing cases on such technicalities leads this writer to observe that there is little wonder that our country has developed into a veritable lawless jungle where life is not safe on the streets in hardly any section of our land. We agree with the wisdom of the great justices of the past that our courts are at least in part a cause of the existing obvious disdain for our laws on the part of many. At best, a reversal on the issue of insanity would create another long delay inexcusably bringing about a waste of additional government money and ju-

dicial time, and at worst might possibly result in the freeing of a dangerous criminal to prey upon and perhaps take the lives of law-abiding citizens.

*Insufficiency of the Evidence of Defendant's Intent to Rob.*

A defendant is generally presumed to intend the natural and probable consequences of his act. In this case, defendant admitted that his purpose was to rob the Post Office. He took a loaded Colt revolver, property of the government, from a mail clerk and the jury had every right to infer from all of the circumstances here that defendant intended to rob the Post Office. *Cf.* Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

*Admissions Made by Defendant.*

Defendant here was warned of his rights prior to the arrival of the police and was not subjected to any interrogation. When the police officers arrived, which was within about five minutes, defendant was arrested and the police officer in charge attempted to advise him of his rights. When he was asked his name, defendant replied, "I don't have to say a thing. I can read the papers." During the course of the attempt to again warn him of his rights, defendant interrupted and said with some profanity, "I well know my rights. I just came here to rob the post office."

In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court said at page 478, 86 S.Ct. at page 1630:

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any

statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

The statements made by defendant were volunteered and no court has ever held such statements inadmissible.

Finding no merit to any of the defendant's contentions, the judgment of conviction is affirmed.

LAY, Circuit Judge (dissenting).

I respectfully dissent.

I, too, share the majority's concern over reversals based on technical error in criminal cases. Surely, this does not mean, however, that one's zealous search for law and order should allow the denial of opportunity for a fair trial to be relegated as a "bare technicality."

I have difficulty in distinguishing the present case from this court's recent decision in United States v. Schultz, No. 19,809, 431 F.2d 907 (8 Cir., July 17, 1970). In *Schultz* under the facts presented we held that it was error for the district court to deny the defendant's motion for an independent psychiatric examination under the Criminal Justice Act. 18 U.S.C.A. § 3006A(e).[1] This

---

1. 18 U.S.C.A. § 3006A(e) reads:
   "Counsel for a defendant who is financially unable to obtain investigative, expert, or other services necessary to an adequate defense in his case may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the defendant is financially unable to obtain them, the court shall authorize counsel to obtain the services on behalf of the defendant. The court may, in the interests of justice, and upon a finding that timely procurement of necessary services could not await prior authorization, ratify such services after they have been obtained. * * * "

court found that § 3006A(e) laid down "a two-prong test"; first, a showing that the accused is indigent and second, a "need for such services to present an adequate defense." There is nothing in the record to contradict Maret's compliance with these requirements. We further observed that: "the courts ought to apply a more lenient standard [under § 3006A(e)] in determining the need for services of experts in preparation for trial than that applied under 17(b) [Fed. R.Crim.P.]." When the factual circumstances are so similar, as they are in the instant case with those in *Schultz,* I would think our holding in *Schultz* to be controlling.

The denial of the defendant's motion for an independent psychiatric examination in *Schultz* occurred in May 1969. The denials of defendant's motions in this case occurred in April, June and September of 1969.[2] It is significant that the same trial judge presided over both cases and in each the denial was based upon the ground that the government psychiatrists at the Springfield Medical Center had conducted a competency examination. Thus, one may reasonably conclude that the denial here was in conformity with an established practice of the district court, rather than a singular determination of the alleged necessity of the examination and requested services of an expert witness as required under the Act. The court observed that the motion indicated the defendant's attorney considered the Springfield doctors either "incompetent" or "prejudiced." With these statements the motion for an independent examination was denied.

The facts in the *Schultz* case are strikingly parallel. First, Maret's actions at

the post office present a bizarre picture. Maret told federal employees when he first entered the post office that he wanted to be taken to the Provost Marshal and that he wanted the F.B.I. called so he could turn himself in. When a postal official called the F.B.I. agent Maret went to the phone and said, "Hi, you, Pop, how are you doing?" His additional actions, as described in the majority opinion, give one reasonable cause to question the mental competency of the defendant at the time of the offense. At least the government prosecutor felt so at the time.

Shortly after Maret's arrest, the United States Attorney moved, as in *Schultz*, pursuant to the provisions of 18 U.S.C.A. § 4244, for a judicial determination of the defendant's competency to stand trial. The order for the examination recited that the accused "may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense * * *." This order was entered on the 29th day of July, 1966. On April 16, 1969, after Maret was allowed to withdraw his guilty plea, and prior to his trial, the district court ordered another competency determination: "Pursuant to 18 U.S.C. § 4244, on motion of counsel for the defendant for a psychiatric examination, and *it appearing that the defendant may have been mentally incompetent at the time of the offense for which he is charged,* may be presently insane, or otherwise so mentally incompetent as to be unable to understand the proceedings against him or to properly assist in his own defense * * *." (My emphasis). This order reflects that the trial court sufficiently understood that the

---

2. Maret's counsel filed a written motion for an independent examination on April 1, 1969. At the arraignment and hearing to determine competency on June 13, 1969, Maret's counsel asked that an independent psychiatrist, a Dr. Bergman of St. Louis, review the government's medical reports. Counsel stated to the court: "I will renew my written motion to this extent. I would like to have a copy of the evi-

dence found by the Medical Center sent to Dr. Bergman so he can evaluate it for my benefit so that I know I am on a sound basis." The trial judge denied this request because he was not acquainted with Dr. Bergman. The third request for an independent examination was made on the first day of trial, September 2, 1969. This was likewise denied.

purpose of the defendant's motion was to determine whether the defense of insanity could be raised on behalf of the defendant.[3] Without the benefit of psychiatric testimony the defendant's counsel was not in a position to raise the defense.

The majority opinion points out that the April 16, 1969, order for an examination by the government psychiatrists directed a determination not only of Maret's competency to stand trial but also of his mental competency at the time of the criminal offense. In *Schultz* a significant factor in finding the denial of an independent examination to be error was that the government examinations at Springfield covered only the status of Schultz' competency to stand trial under § 4244 and not his competency at the time of the offense. As pointed out by Judge Bright in *Schultz,* "a substantial difference may exist between the mental state which permits an accused to be tried and that which permits him to be held responsible for a crime." A review of the June 5, 1969, report from the Springfield Medical Center in the present case reveals that the government psychiatrists, notwithstanding the trial judge's direction, conducted their examination *only* for a determination of competency to stand trial. The concluding paragraph of the "Special Progress Report" forwarded to the court reads: "It is the opinion of the Neuropsychiatric Staff that this patient is ready to return to court and that if a competency hearing is held that findings support adjudication of competency." This was the same limited finding made in the psychiatric report of October 1966. This is the identical conclusion written by the Medical Center in the *Schultz* case.

Another similarity of Schultz and Maret is reflected in the medical history relating to behaviorial disorders of the two defendants. Maret's history shows he was treated by Army psychiatrists who felt he "was an emotionally unstable personality, manifested by impulsivity, immaturity and suicidal gestures." He was discharged from the Army for being A.W.O.L. and because of his drinking. The diagnostic impression of Maret from the Springfield Medical Center on September 22, 1966, reads: "000-x61 sociopathic personality disturbance, antisocial type, characterized by poor judgment and impulse control, emotional immaturity, and the seeking of personal gratifications on a hedonistic level."

This same diagnosis was made in 1969 by the Springfield Medical Center staff. However, in the interim commitment at Leavenworth Maret had been transferred to Springfield on February 28, 1968, for neuropsychiatric treatment because of a "behavior problem and aggressiveness toward other inmates." In 1967 at Marion penitentiary he was placed in segregation "for his protection as he was talking about committing suicide by 'cutting my throat'."

There can exist little doubt that absent Maret's indigency, his counsel would have procured before trial independent psychiatric opinion as to the defendant's competency at the time of the offense in question. Such an examination would have aided the defense counsel's cross-examination of government psychiatrists and his defense to prove the defendant's lack of intent to rob the post office. In my judgment, the need for such services, under the facts presented, is clearly demonstrated and one must conclude that the defendant was denied the right to an in-

---

3. The district court asked defendant's counsel the purpose of his motion for an independent examination after the Medical Center's report had been received. Counsel replied: "To determine in my own mind the ability of this man to know both now and in the past what he was doing and the effect of his acts." Furthermore, the original written motion filed by defendant's attorney on April 1, 1969, specifically stated: "Counsel for defendant further states that the above tests, examinations, records and reports are necessary for the preparation of the defense of the defendant; and that the defendant does not have funds to pay for such tests, examinations, records and reports."

dependent psychiatrist's services solely because of his financial inability.[4]  An adversary's expert witness is not the hall of knowledge for opposing counsel's preparation and defense.   As Judge Bright, himself a former successful trial practitioner, so cogently observes in *Schultz:* " * * * the adversary system cannot work successfully unless each party may fairly utilize the tool of expert medical knowledge to assist in the presentation of this issue to the jury."

I would reverse the judgment of conviction and would order prior to retrial an independent psychiatric examination of the defendant to determine his mental competency at the time of the criminal offense charged.

4.  Since I would reverse the judgment because of error under § 3006A(e), I need not discuss the constitutional implications of a denial of psychiatric services where both need and indigency are demonstrated.  Cf. Long v. District Court, 385 U.S. 192, 87 S.Ct. 362, 17 L.Ed.2d 290 (1966) ;  Draper v. Washington, 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963) ; Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, 17 L.Ed.2d 290 (1956).  And see Mr. Justice Clark's admonition in Smith v. Bennett, 365 U.S. 708, 713, 81 S.Ct. 895, 898, 6 L.Ed.2d 39 (1961) :  "When an equivalent right is granted by a State, financial hurdles must not be permitted to condition its exercise."