**Edward Lee NEWBOLD, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. 57247.**

Supreme Court of Missouri,
Division No. 1.

March 12, 1973.

Motion for Rehearing or to Transfer to Court En Banc Denied April 9, 1973.

Joseph W. Lewis, Lawrence Alan Waldman, St. Louis, for appellant.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Special Asst. Atty. Gen., St. Louis, for respondent.

HIGGINS, Commissioner.

Appeal (taken prior to January 1, 1972) from denial, after evidentiary hearing, of motion under Rule 27.26, V.A.M.R., to vacate and set aside three judgments of conviction entered upon pleas of guilty to three indictments filed February 20, 1968, charging attempted robbery, first degree, with a dangerous and deadly weapon, assault with intent to kill with malice, and murder, first degree.

As grounds for relief, movant asserted: (a) he was mentally incompetent at the time of his plea of guilty to three separate charges and when he was sentenced to imprisonment on concurrent terms of five years, life and life; (b) he was denied constitutional right to fair trial by failure of trial court to comply with Chapter 552, RSMo 1969, V.A.M.S., in that he was not accorded a hearing and judicial determination of his competence to stand trial prior to the time his pleas of guilty were accepted by the court; (c) he was denied effective assistance of counsel by reason of counsel's ignorance of the provisions of Chapter 552, supra; (d) he was coerced into pleading guilty; (e) his guilty pleas were involuntary and accepted in violation of Rule 25.04.

The transcript of proceedings in the Circuit Court of the City of St. Louis before the Honorable J. Casey Walsh on May 21, 1969, shows: that defendant, Edward Lee Newbold, was present at all times, with one of his appointed lawyers, Mr. Ben G. Landau; that the charge of murder, first degree (356–Q), was called, and Mr. Landau announced defendant's guilty plea; that upon request of the court Mr. Robert Curran, assistant circuit attorney, stated the facts: " * * * this involves an incident that occurred on the 6th day of January, 1968 about 12:35 in the morning at 3160 Park Avenue in the Weber's Tavern located there in which Mr. John Weber was the operator of the tavern and present in the tavern were three people, Mr. George Pretysch, his wife Jeanette Pre-

tysch, one Beatrice Garrison. Approximately this time, Mr. Weber, preparing to close, was counting some money and defendant came in, produced a weapon, at which time Mr. Weber also produced a weapon and there was an exchange of gunfire. Mr. Weber on the 16th day of January, 1968 as a result of these shots fired expired at the hospital and the gun was later recovered from Mr. Newbold, and ballistically was checked. The bullet that killed Mr. Weber was fired from the gun that was later recovered from Mr. Newbold. Mr. Newbold also in talking to Corporal Griffin remembered being in the tavern, stated he didn't remember firing any shots. He remembered being shot at." Mr. Curran also stated the availability of witnesses to these facts.

Upon questions from the court, defendant admitted the truth of the recital of facts, his engagement in the shooting affair, his guilty plea, that he shot Mr. Weber in the tavern, that he understood the range of punishment of life imprisonment or death, that such had been explained to him by Mr. Landau, that he was advised of all his rights including jury trial, that by his guilty plea he was waiving his right to jury trial, his age, 21, his education, two years at the University of Houston. In explanation, defendant stated he was intoxicated, guessed he got scared and did not remember the details of the attempted robbery and the consequent shooting. He recognized that his intoxication did not excuse his unlawful actions. His family of mother and two sisters lived in St. Louis, and he had discussed his plea of guilty with Mr. Lee Weber, family friend and St. Louis City alderman.

Mr. Landau expressed his position: "I talked to Mr. Newbold numerous occasions; I talked to his mother, too, not about this plea of guilty because he does have a problem, a psychiatric problem, and his mother recognizes this. Mr. Newbold recognizes this; Mr. Weber does, too. I have talked to him on many occasions, and it appears to me that the evidence that the

State has is overwhelming and so that under the circumstances I did not, I asked Mr. Newbold as well, to make up his own mind—I couldn't make up his mind in this case as serious as this."

The court observed from a psychiatric report concerning defendant: "that the accused has no mental disease or defect within the meaning of Section 552.010, that the accused has the capacity to understand the proceedings against him and can assist in his own defense, accused did know and appreciate the nature, quality and wrongfulness of the offense with which he is charged. So they find that he's capable of assisting in his own defense and that he knew what he was doing."

Allocution was then granted, after which the court assessed punishment at imprisonment for "the rest of your natural life" on the charge of murder, first degree.

The transcript of proceedings of May 21, 1969, shows further the immediate calling of the charge of assault with intent·to kill with malice (355–Q), and Mr. Landau announced defendant's plea of guilty as charged. Again, upon request of the court, Mr. Curran recited the facts: " * * * This involves the same evening or same morning * * * January the 6th, 1968 at 3:40 A.M. 3028 South Grand Avenue in the City of St. Louis. It is a corner of Grand and Arsenal. Located there on the northeast corner is the Little Eatmore Restaurant which was occupied at the time by two people, one Lorraine Oppenheimer who was a waitress and one Donald Boulch who was eating * * * at the counter. At this time Mr. Newbold came in, produced a weapon and announced to Miss Oppenheimer that it was a * * * hold up, at which time she went behind the counter to get the money. Mr. Boulch at this time, figuring that he could get the jump on Mr. Newbold, had a sugar container and went after him. Mr. Boulch was shot twice in the upper chest during the course of the struggle that ensued, went through a plate glass window and

also the gun—Mr. Newbold's gun, glasses and hat were left at the scene. Approximately one-half hour later there was a police call for an injury at 3405 Pestalozzi which police—same officer—Officer Dunsford that had received the original call at the Little Eatmore responded. He recognized the description and the general cut on the head which was the result of the sugar dispenser—Mr. Newbold's head. He arrested him. There was a search conducted incident to that arrest and in which some cartridges, twenty-two caliber, were found in the apartment of Mr. Newbold. These were matched to the gun found at the scene of the Little Eatmore which, of course, was the gun also matched to the bullets found in Mr. Boulch, removed at the hospital. Separately from that, there are two other people on the street in addition to Miss Oppenheimer and Mr. Boulch who identified this defendant."

Upon questions from the court, defendant, after first determining whether the facts related to "Grand and Arsenal," again admitted the truth of the recital of facts, stated he was on dope, and that he did not know "about the malice part." He again acknowledged his guilty plea, and stated he did not remember falling through the window due to being "messed up" with the influence of drink and narcotic drugs. He again acknowledged discussion of his guilty plea with Mr. Landau, that he was fully advised of his rights including right to jury trial, and that he did not want a trial but wanted to plead guilty. Mr. Landau stated he had investigated this case including interviews with his mother and witnesses Oppenheimer and Boulch. "His glasses were in the place" and the evidence of guilt of this charge was "overwhelming," also. Defendant again acknowledged his understanding of the range of punishment, "from imprisonment for two years to life," and that his guilty plea was his free and voluntary act. He also stated, in answer to the court, that nothing had been promised to cause him to plead guilty and that he had not been intimidated or forced or threatened into entering his guilty plea.

Allocution was then granted on the charge of assault with intent to kill, after which the court assessed another life sentence to run concurrently with the sentence imposed under Cause No. 356–Q.

The transcript of proceedings of May 21, 1969, then shows the immediate calling of a charge of attempted robbery, first degree, with a dangerous and deadly weapon (354–Q) and Mr. Landau announced the third of defendant's guilty pleas. Mr. Curran stated "this also involved the incident in the Little Eatmore," which the court recited "was interfered with by Mr. Boulch? Well, I still relate back, Edward Lee Newbold, to this case which happened down on Grand and Arsenal where they say you went in there and attempted to rob the place. You still say you were under influence of dope, of narcotics. Of course, that is no excuse, * * * but the evidence according to your attorney is overwhelming against you." Both Mr. Landau and defendant stated their understanding that the charge arose out of the incident at Grand and Arsenal previously described. Defendant again acknowledged explanation of his rights including entitlement to jury trial, that he was waiving right to trial, and that he had gone over all such matters with Mr. Landau. Upon request of the court, Mr. Landau explained: "We got appointed, I guess, about two or three months ago and then afterwards—maybe five or six months ago, I thought this case was beyond my capacity to try it so I asked Judge McMullen to appoint an associate with me. He appointed Bob Keaney and Bob Keaney and I have done a great deal of investigation in this matter, and he just went to Mexico, Missouri to interview another witness just last weekend."

This was amplified by Mr. Curran: "I might add for the record that Mr. Landau was appointed on the 20th of December, 1968, and Mr. Keaney appointed on January the 2nd of this, 1969. Prior to that time the Public Defender, Mr. George Hubel, had represented Mr. Newbold. I wish to say that all three attorneys, Mr. Hubel, Mr. Landau, Mr. Keaney, have been in constant communication with me and we have proceeded—the fact that a psychiatric examination was had—we have proceeded as rapidly as possible considering the seriousness of the matter."

Mr. Landau explained further that he had conferred with his client "about eight or ten [times] and I have seen his mother on four or five occasions. I've had an investigator on this matter who spent maybe a week * * * and I've been in touch with Mr. Keaney very often. Mr. Keaney has done a lot of work independently of me." He stated also that he had interviewed all the witnesses and concluded the evidence of his client's guilt was "overwhelming." Allocution was then granted on the charge of attempted robbery, first degree, with a dangerous and deadly weapon, after which the court assessed a term of five years' imprisonment to run concurrently with the concurrent life sentences imposed in Causes 356–Q and 355–Q. Defendant was credited also with jail time from January 6, 1968. Before the proceedings closed, defendant asked, " * * * when you say the rest of my natural life, do I get a chance for a parole?" The court answered with its understanding of parole eligibility, after which defendant indicated his understanding and felt only that the court "mixed me up when you said 'natural'—'the rest of my natural life.' "

The evidentiary hearing was accorded June 11, 1971. Edward Lee Newbold then took the position he pleaded guilty "with the understanding that I would be sent to Fulton. * * * The prosecutor said that this rehabilitation thing at Fulton is where I would be going. That's why I was under the impression I would be going there." Mr. Landau and Mr. Keaney "just said for me to make up my own mind. They said they knew I needed help and I knew I needed help and they figured this would be the best thing for me." His mother and sister "told me, you know, that I should go —when I go to Fulton I should try to straighten up and help myself." Prior to

trial he was transferred from jail to Malcolm Bliss Hospital, then to Fulton State Hospital, and returned to jail to await trial. A motion under Chapter 552 RSMo 1969, V.A.M.S., was filed in his behalf to accomplish the transfers to Malcolm Bliss and Fulton. No plea of not guilty by reason of mental disease or defect was ever entered. Upon his return to jail from Fulton another motion in his behalf was filed under Chapter 552 seeking examination by a psychiatrist of his own choosing at the cost of the state. The motion was sustained for the examination but overruled as to charging the cost to the state. Defendant never availed himself of the second examination, and the court explained: "That's standard procedure—we don't pay for private psychiatric examinations. We give * * * any defendant the right to have a mental examination, but the State's facilities are the State's institutions and if they don't agree with either of the State's institutions * * * I don't think it is incumbent upon the State—to go out and hire a private psychiatrist to refute their own institutions." Movant asserted also that he pleaded guilty to get out of the city jail.

Upon cross-examination, movant acknowledged he was told of the punishment and that he was not coerced or forced to plead by any physical abuse. "* * * it would come under a mental third degree." Judge Walsh did not promise him anything. Mr. Landau "told me I would go to Fulton under a rehabilitation program." He did not mention this to Judge Walsh when he pleaded guilty—"I was told not to say anything" by his lawyers and the prosecutor. He acknowledged his testimony to Judge Walsh that he had not been promised anything and that the court read the pertinent part of his psychiatric report from Fulton State Hospital. He denied that Mr. Landau saw him on numerous occasions, but acknowledged that he saw him five times or less. In a final effort to make the hearing exhaustive, the court asked if movant had anything else he wanted to say as a reason why he should be released from the penitentiary. He responded: "I don't feel that the time I got is necessary for that crime [murder] * * *. I think I should get another trial. * * * I don't think that Judge Walsh should accept a guilty plea on first degree murder when I more or less told him * * * after I read the transcript —looked to me like I pleaded self-defense. * * * My mother thought I should go to Fulton."

Judge Walsh recalled the proceedings in acceptance of the three guilty pleas of Edward Lee Newbold. He felt the court's interrogation at that time had been "quite extensive." He promised defendant "nothing whatsoever," and he was threatened in "no manner whatsoever." Defendant was present with his lawyer, Mr. Landau, as was the assistant circuit attorney, Mr. Curran. "There was nothing unusual about his behavior and nothing unusual about the way he answered the questions. As far as I was concerned he seemed perfectly normal. * * * I thought he was alert. I remember * * * when I got to the part of sentencing this man, I said, 'You are sentenced to spend the rest of your natural life in the penitentiary,' and he picked up the word 'natural' and I had to explain to him it was a technical term. He wanted to know what 'natural' meant in the sense that I sentenced him. * * * He told me he was under the influence of alcohol and narcotics and he did not recall what happened. * * * But according to all the facts * * * it appeared that he went in there for the purpose of robbing the tavern." This was indicated by the report of the crime and his agreement with everything Mr. Curran said at the beginning of the hearing. "* * * when I started inquiring further into the matter, then he started to come up with this statement about being intoxicated and being under the influence of drugs when he committed this crime. * * * I never heard anything about a promise about going to Fulton. I thought he fully understood he

was going to the penitentiary after I got through talking to him. * * * The only knowledge I have of anything about his mental condition was a report Mr. Curran had." With respect to a hearing or with respect to competency, "the question never came up."

Mr. Landau never promised his client that he would go to any institution, Fulton or otherwise, if he pleaded guilty. "The first time I had an indication he wanted to plead guilty was when I got a letter from him dated May 16, 1969. * * * Before that he had told me on numerous occasions he was not guilty and we investigated—he had four or five different stories, which we investigated." Neither he nor anyone else ever threatened defendant to plead guilty. "I saw him at least once a week until about a week before this letter. I reviewed with him our investigations, the various statements he made about who committed the crime, where it was committed and so forth and his non-presence and things of that sort. He gave me numerous witnesses. I hired an investigator to go out and interview these witnesses." His client never showed any indication of mental disease or defect, "But at the same time because of his history we thought we should investigate this thing. I had the report of his examination at Fulton and also at Malcolm Bliss, his treatment at the Wynne Center in Texas * * * in connection with the state penitentiary. * * * The Texas institution did not make a finding and we also had the benefit of his treatment at the Child Guidance Clinic. I told him I did not know whether he would be sent to Fulton or not, because I didn't know anything about the rehabilitation program. * * * After my conversation with him at the jail that morning I went to speak with Mr. Curran to get some information. I came back and told him in the event he pleaded guilty, if he wanted to plead guilty, then Mr. Curran, myself, Mr. Hubel, and Mr. Keaney would write letters to the warden of the penitentiary asking him to refer Mr. Newbold to Fulton for

treatment and so forth. We told him that we cannot promise that this would happen * * *." The letters were written. Mr. Landau also conferred with Mr. Hubel of the Public Defender's Office because he was first attorney of record, made the application for examination, and had a big file on the client. After the second examination request was sustained but the cost of it denied, Mr. Landau had further discussions with his client relative proceedings under Chapter 552, RSMo 1969, V.A. M.S. "At that time he said, 'I will not go to Fulton under any circumstances.' Despite that, Mr. Keaney and I thought we ought to give the man a benefit of the doubt. So I talked to two psychiatrists about examining him. I gave them all the reports I got to see if they would examine him because we figured if we should overrule him, if we had evidence that he was insane."

Mr. Keaney, appointed as cocounsel with Mr. Landau, spoke with his client four or five times. No one promised him anything in consideration of guilty pleas, or coerced him in any way; "at all times to me he pleaded his innocence. * * * I thought he was above average in intelligence. * * * He understood my questions * * * and understood the answers he gave me." He was aware of his client's background of "mental illness, mental disturbance, and I investigated that background." He discussed the ruling on the motion for a second psychiatric examination at state cost with his client.

Mr. Curran also was unaware of any promises, threats, or coercion with respect to the guilty pleas of Edward Lee Newbold, and there was nothing in defendant's behavior to indicate a person who is mentally ill or otherwise retarded; he was a normal individual. He explained to defendant that when persons are inducted at the penitentiary they are evaluated as to where they should be sent, "and the warden * * * has various options * * * and * * * also in the penitentiary there is psychiatric available, and

one of those psychiatric things in the ultimate would be Fulton * * *. I would recommend that the psychiatrist up there look at him to see if he did need it."

The record further shows that Edward Lee Newbold was admitted to Malcolm Bliss Mental Health Center September 5, 1968, "for pretrial psychiatric evaluation. He was discharged on September 11, 1968, because he was considered as an escape risk * * *." Per Fulton State Hospital certificate of December 11, 1968, Edward Lee Newbold, 21, Caucasian male, was readmitted to that hospital September 24, 1968, for pretrial examination pursuant to Section 552.020 while awaiting trial in St. Louis on charges of attempted robbery with a dangerous and deadly weapon, assault with intent to kill with malice, and murder, first degree. His previous admission to Fulton State Hospital was July 5, 1963, and his diagnosis September 23, 1963, was "Adjustment Reaction of Adolescence (Behavior Disorder). * * * he has used drugs such as morphine, marijuana, sleeping pills, amphetamines and heroin." His physical condition was satisfactory. "He is oriented for time, place and person. * * * His memory appears to be unimpaired for both recent and remote events. * * * He is coherent, alert, relevant and there are no delusions or hallucinations. * * * There is neither depression nor elation and his mood is appropriate to the situation. * * * Psychological tests indicate he is functioning in the average range of intelligence and the tests failed to indicate the presence of an organic disorder or of a psychosis." His diagnosis was "Antisocial Personality." The hospital found: "(1) That the accused has no mental disease or defect within the meaning of Section 552.010. (2) That the accused has the capacity to understand the proceedings against him and can assist in his own defense. (3) That the accused did know and appreciate the nature, quality and wrongfulness of the offenses with which he is charged," and recommended "that he be returned to * * * the Cir-

cuit Court * * * for disposition of the charges against him." Upon receipt of the report from Fulton State Hospital, the cause was removed from the mental examination docket and placed on the trial docket.

The evidence and posture of this case have been stated in detail because such a statement demonstrates that the court's findings, conclusions and judgment in denial of movant's grounds for relief are not "clearly erroneous" for any of the reasons now presented. Rule 27.26, supra; Crosswhite v. State, 426 S.W.2d 67, 70[1] (Mo. 1968).

Appellant contends, first, that the court erred in overruling his motion by failing to find that he "pleaded equivocally when he entered his guilty pleas."

■ Appellant argues that the court thus violated Rule 25.04 and, in support, he emphasizes his "Yes" answers to pertinent questions and his inability to relate all the facts of the charges, particularly of the murder charge, when he pleaded guilty. He also emphasizes the "I don't know what happened" testimony given on his position at the evidentiary hearing. The issue thus presented is whether defendant's inability to state details of the robbery and shootings in the plea proceedings, coupled with similar testimony at the evidentiary hearing, when considered with all the evidence, rendered his guilty pleas equivocal.

The record of proceedings on defendant's guilty pleas demonstrates the absence of coercion or promise; that he was fully advised of his rights including right to speedy jury trial; that he had intelligence and education and understood the proceedings, the ranges of punishment, and the consequences of pleading guilty; that he had effective assistance and advice of counsel and access to family and friends; that he admitted the recited facts of the offenses irrespective of his own inability, due to asserted intoxication, to relate them; that he did not claim innocence; that the State's evidence was, in counsel's judgment, overwhelming; that defendant

chose to plead guilty under these circumstances, and the proceedings provided a factual basis for the guilty pleas.

Such record satisfies the thesis of State v. Reese, 457 S.W.2d 713, 717[2] (Mo. banc 1970), "the greater the offense the greater is the reluctance of the courts to accept a plea of guilty"; and it established the voluntariness of defendant's guilty pleas as opposed to the charge they were equivocal. McMann v. Richardson, 397 U. S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); Jones v. State, 471 S.W.2d 223, 227, 228 (Mo. 1971). Compare the opposite result in State v. Williams, 361 S.W.2d 772 (Mo. banc 1962), where, in contrast to this record, the guilty plea to murder made by defense counsel was of an equivocal nature stating they had to make it because defendant did not know where he was or what he did and that, after investigation, they were not sure of his guilt; and the plea was accepted without questioning, cautioning, or saying anything to the defendant, or in any way asking if he assented to the plea.

■ Appellant contends, next, that the court erred "by failing to find that [he] was misled and induced to plead guilty under the misapprehension that he would receive treatment" at Fulton State Hospital, "rather than be sentenced to the penitentiary."

Appellant's argument on this point emphasizes his testimony at the evidentiary hearing that he pleaded guilty with the understanding he would be sent to Fulton State Hospital for treatment, and that it was so represented to him by the prosecution, his counsel, his family and friends.

Appellant's argument and his preferred testimony must be considered with all the evidence on the issue. The record also shows an absence of such position in the plea proceedings; that Mr. Landau told his client he did not know whether he would go to Fulton, and that he promised only that he and the other attorneys would

write to the penitentiary requesting treatment for defendant at Fulton. He made it clear that no one was promising him treatment or confinement at Fulton; that none of the attorneys could require specific action of the warden. The record shows also Mr. Keaney's version that he never discussed Fulton State Hospital with his client, and Mr. Curran's version that he simply told defendant of options available to the warden, and denied any promise to defendant other than that he would also write a letter to the warden bringing to his attention defendant's own thought that he needed treatment. Appellant's version must also be considered against his position as related by Mr. Landau that he would not go to Fulton under any circumstances, and his denial of any coercion, threats, promises, or other inducements when he pleaded guilty. Of value also on this question is the prior determination that the record demonstrates the guilty pleas to have been voluntary as opposed to a charge that they were equivocal.

Upon such record, there is obvious conflict between appellant's version of the circumstances surrounding his guilty pleas and the versions shown by his attorney's testimony and of the whole record. The court, as required by Rule 27.26, supra, resolved the conflict by deciding that appellant did not plead guilty under the misapprehension or inducement that he would go to Fulton. In so doing, the court believed the version demonstrated by the total record rather than that of movant, and the evidence supports the court's resolution of the issue. Collins v. State, 450 S.W.2d 186, 190 [2, 3] (Mo.1970); State v. Rose, 440 S.W.2d 441, 443 [4], 445 (Mo.1969); Peterson v. State, 444 S.W.2d 673, 676 [5, 6] (Mo.1969). Compare the opposite result in The State v. Stephens, 71 Mo. 535, 536 (1880), when the record showed conclusively that defense counsel had an interview with the trial judge "and were led to believe, by the words and acts * * *, that if the defendant would plead guilty, he would receive the lowest punishment al-

lowed by law; that this understanding was communicated to defendant, who thereupon pleaded guilty, but instead of the lowest, was awarded the highest punishment * * *." And compare also the different result in State v. Roach, 447 S.W.2d 553, 557 (Mo.1969), where there was no basis on the record for the court's determination that defendant's plea was voluntarily made in compliance with Rule 25.04, supra, and the record otherwise clearly showed that defendant had reason to believe he would be granted probation if he pleaded guilty.

◼ Appellant's third point is that the court erred in not finding a violation of his rights under Amendments V and XIV, United States Constitution, and Section 10, Article I, Missouri Constitution, V.A.M.S., in that the trial court failed to conduct a hearing on his competency at the time of his guilty pleas and imposition of sentences.

Appellant's contention is based on Pate v. Robinson, 383 U.S. 375, 385, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966): "* * * Where the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial, the judge on his own motion must * * * conduct a sanity hearing * * *." See also McCormick v. State, 463 S.W.2d 789, 790 (Mo.1971).

Appellant's argument refers to the evidence of the granting of the initial motion for psychiatric examination, the commitments to Malcolm Bliss and Fulton State Hospitals for that purpose, his inability to state details of his criminal conduct, recognition by counsel and friends of prior mental problems, the letters counsel agreed to and did write to the warden, the application for a second examination by a psychiatrist of his own choosing, and those parts of the report from Fulton State Hospital describing his juvenile record of arrests, elopement from detention, and use of drugs.

Again, appellant's argument and evidence must be considered with all the evi-

dence on the issue. The record also contains the report of psychiatric examination of defendant at Fulton which shows that defendant had no mental defect or disease as recognized by Chapter 552, RSMo 1969, V.A.M.S; that he had capacity to understand proceedings against him and to assist in his own defense, and that he knew and appreciated the nature, quality and wrongfulness of his offense. The record further shows request for a second examination which was granted but, upon the court's unwillingness to provide for its payment, defendant declined to pursue it. It shows also that counsel took the Fulton report and consulted with two psychiatrists to determine whether to seek additional examination. The proceedings at the guilty pleas transpired without further mention of a desire for further examination or the presence of mental disease or defect; and, as stated by Judge Walsh, there was no issue of defendant's competency at the plea proceedings. Nothing in the record indicated incompetency of defendant when he was pleading, and no question was directed to the Fulton report. At the most, the record indicated only that he had some history of mental problems and an inability to detail the facts of his crimes. There is even positive evidence of his rationality in his question to the court for the meaning of imprisonment "for his natural life."

Again, the total record shows a conflict in the evidence on the issues of defendant's competency and the need to hold a competency hearing, and the court resolved the issues against defendant. In so ruling, the court was not clearly erroneous because the record supports the court's decision.

◼◼ Several principles and cases lend support in law to the court's findings on this issue: An accused is competent to stand trial (or to plead guilty) if, at the time, he can rationally consult with counsel and the court and understand the proceedings against him. Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); Heard v. United States, 263 F. Supp. 613 (D.C.1967). This is shown by

the psychiatric report from Fulton State Hospital and the plea record. The presence of a mental problem does not raise the *bona fide* doubt requiring a hearing *sua sponte* under Pate v. Robinson, supra, if the accused is not hindered in understanding the proceedings and in assisting counsel. United States v. Kaufman, 393 F.2d 172, 176 (7th Cir. 1968); Whalem v. United States, 120 U.S.App.D.C. 331, 346 F.2d 812 (1965). Again, the plea record and examination report support the trial court. The *bona fide* doubt of Pate v. Robinson, supra, may arise subsequent to a "clean" mental health report, but only when strong doubts are voiced at the subsequent proceedings, Wider v. United States, 121 U.S.App.D.C. 129, 348 F.2d 358 (1965); or when the court observes erratic behavior of defendant at the subsequent proceedings, Pouncey v. United States, 121 U.S.App.D.C. 264, 349 F.2d 699 (1965), or when drug withdrawal symptoms are present at the subsequent proceedings, Hansford v. United States, 124 U.S.App. D.C. 387, 365 F.2d 920 (1966). This record does not show any of these circumstances present at the plea proceedings.

In point is Jones v. State, supra, 471 S. W.2d l.c. 226–227 [2]: "The first point * * * is that the trial court erred in failing to find that defendant had been denied due process of law by the failure of the court to hold a hearing upon his competency to stand trial prior to the entry of his plea of guilty. We rule this contention adversely to defendant because * * * the facts here did not require such a hearing. In the first place we do not see that there was ever a bona fide doubt raised concerning defendant's competency to stand trial. His counsel saw nothing which caused him to have a doubt, but filed the unverified motion for an examination because defendant's mother told him of the incident concerning the blow from the baseball bat. Thereafter, in ordering the examination, it does not appear that the trial court actually made a finding that there was reasonable cause to believe that defendant had a mental disease because the assistant circuit attorney consented to the order. The conclusion that defendant was then competent is fortified by the opinion of his physician that four years after he was struck by the baseball bat he could understand the nature of charges that might be brought against him. When the report showing full competency was filed defendant did not seek any additional examination, nor did he in any way contest the opinion contained in the report or request a hearing on the issue. In this situation § 552.020(6) provides that 'the court may make a determination and finding of record on the basis of the report filed or may hold a hearing on its own motion.' What the court did was to enter the following order: 'Medical report received. Cause removed from Mental Examination Docket and placed on Trial Docket. Cause set for trial on July 8, 1968.' We think that order is tantamount to an order finding that defendant was fit to proceed. The statute under which the examination was ordered provides that 'No person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures.' § 552.020(1). The court obviously approved the report and concluded that defendant was fit to proceed or it would not have ordered the case set for trial. The court expressly reaffirmed that finding at the time of deciding the 27.26 motion.

"In support of his contention defendant relies on Carpenter v. State, Mo.Sup., 449 S.W.2d 584, Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815, and Brizendine v. Swenson, D.C., 302 F.Supp. 1011. All of those cases are clearly distinguishable on the facts and, in our opinion, do not support defendant's contention." See also Maggard v. State, 471 S.W.2d 161, 165 (Mo.1971).

This case differs from Jones v. State, supra, perhaps, in that defendant did seek an additional examination but, having been denied its cost, he nevertheless did not in any way contest the Fulton opinion. Nor was this a simple default because counsel did consult with two psychiatrists on the need to have further examination and, after being satisfied of the futility of such course, never again raised the issue.

Brizendine v. Swenson, 302 F.Supp. 1011 (W.D.Mo.1969), cited by appellant, is no longer the standard in these situations even in the United States District Court for the Western District of Missouri. In Gregg v. Missouri Department of Corrections, 335 F.Supp. 344 (W.D.Mo.1971), petitioner sought relief directly in the federal court claiming "exceptional circumstances" by way of a "foregone conclusion" that Missouri courts will not follow the standards enumerated in Brizendine v. Swenson. The district court observed that neither Missouri nor the federal appellate courts now equate the "substantial doubt" of Brizendine v. Swenson with the *bona fide* doubt of Pate v. Robinson, supra, before a court need grant a competency examination. "The United States Court of Appeals recently spoke on this issue * * * United States v. Maret (C.A.8) 433 F.2d 1064, holding that when a presentence psychiatric report 'does not indicate a state of present insanity or mental incompetence, the trial court is not required to take any other action prior to trial.' 433 F.2d at 1067. In the case at bar, petitioner relies on * * * Brizendine v. Swenson, * * * which was issued prior to * * * United States v. Maret, supra." 335 F.Supp., l.c. 346. See also State v. McCormick, supra, 463 S.W.2d l.c. 790, and see Jones v. Swenson, 469 F.2d 535 (8th Cir. 1972), in affirmance of denial of federal habeas corpus in Jones v. Swenson, 339 F.Supp. 789 (E.D.Mo.1972), sought in review and as an attack against Jones v. State, supra.

■ Appellant says of his fourth point that it is "inexorably woven" with the previous point, and that it should "in effect, be superimposed upon the 'statutory' arguments of this point," but in order to avoid repetition, will not be repeated. By this fourth point, he contends the court erred in denying that portion of his motion seeking to have the expenses of a psychiatric examination by a physician of his own choosing taxed as costs under Section 8, Laws 1963, page 680 (Mental Responsibility Law).

The referenced section provides that the court "may at any time tax as costs in the case * * * a fee for the examination and testimony of any physician appointed under * * * this act at the request either of the state or the accused or on the court's own motion."

Appellant now asserts that he did not "avail himself" of the opportunity to have a psychiatrist of his own choosing appointed because he had *no funds to pay the expenses and fees of such examination*, and that he was thus effectively denied the right to the second examination and the opportunity to "contest" the original finding of the Fulton State Hospital.

The quoted language of the act demonstrates that the court is not required to tax as costs the expenses of an examination by a psychiatrist of defendant's own choosing; it simply says that the court may grant an application for such an examination and may tax the expense of it as costs. The explanation and rationale by Judge Walsh given in refusal of the cost of such examinations are consistent with the language of the act. The court provided for a psychiatric examination and report at the cost of the state and exercised its discretion not to provide the cost of a second examination; the court did not deny the application for the examination. This question was ruled recently, State ex rel. Hoover v. Bloom, 461 S.W.2d 841 (Mo. banc 1971), the court

holding that neither the statute nor due process requires the state to pay for the psychiatric examination of an indigent by a psychiatrist of his own choosing. Both statute and due process are satisfied when an examination is conducted by a competent psychiatrist in a position to render his opinion based only upon his professional training. Defendant made no showing that the certificate from Fulton State Hospital was in any way suspect and he does not now so allege or prove.

Appellant again makes reference to some of his authorities under his previous point, particularly Brizendine v. Swenson, supra, implying that the State must pay the costs of an examination by a psychiatrist of accused's own choosing. It is doubtful that the case stands for such a proposition; in any event, it remains that this defendant had a psychiatrist provided by the State and he has recorded no quarrel with the report; a second examination was authorized which defendant never procured, and counsel did consult with two psychiatrists "of his choosing," but did not disclose their opinions, and assisted defendant with his guilty pleas without further reference to the need of any further psychiatric examination.

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

HOLMAN, P. J., BARDGETT, J., and FINCH, C. J., concur.

SEILER, J., not sitting.