**UNITED STATES of America,
Appellee,**

v.

**Martin J. McNALLY, Appellant.**

**No. 73–1061.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 13, 1973.

Decided Sept. 14, 1973.

Rehearing and Rehearing En Banc
Denied Oct. 2, 1973.

Frederick H. Mayer, St. Louis, Mo., for appellant.

David Harlan, Asst. U. S. Atty., St. Louis, Mo., for appellee.

Before GIBSON, LAY and ROSS, Circuit Judges.

GIBSON, Circuit Judge.

Defendant Martin Joseph McNally was indicted for and convicted of hijacking two aircrafts, legally proscribed as aircraft piracy.[1] Following the jury verdict, the Honorable John K. Regan sentenced the defendant to two concurrent life sentences.

On appeal defendant urges four grounds of error, any one of which would require reversal of his conviction.

---

1. 49 U.S.C. § 1472(i) reads:

"Aircraft piracy

"(i)(1) Whoever commits or attempts to commit aircraft piracy, as herein defined, shall be punished—

"(A) by death if the verdict of the jury shall so recommend, or, in the case of a plea of guilty, or a plea of not guilty where the defendant has waived a trial by jury, if the court in its discretion shall so order; or

"(B) by imprisonment for not less than twenty years, if the death penalty is not imposed.

"(2) As used in this subsection, the term 'aircraft piracy' means any seizure or exercise of control, by force or violence or threat of force or violence and with wrongful intent, of an aircraft within the special aircraft jurisdiction of the United States."

He maintains: (1) the District Court should have granted defendant's motions for a change of venue, for sequestration of the jury, and exclusion and control of the press due to prejudicial pretrial and trial publicity, (2) the District Court should have appointed a psychiatric expert of defendant's choice to aid in the preparation of his defense, (3) the District Court should have granted defendant's motion to suppress evidence due to an illegal search of defendant's house, and (4) the District Court should have allowed the defendant 20 peremptory challenges under Fed.R.Crim.P. 24(b), since the charged crime could have resulted in imposition of a death sentence. Rejecting each argument, we affirm the judgment of conviction.

The defendant does not challenge the sufficiency of the evidence to sustain the verdict, and properly so, as the largely uncontradicted evidence overwhelmingly points to defendant's guilt. Since legal issues only are raised, a brief summary of the voluminous facts and evidence should suffice.

On June 23, 1972, at approximately 2:35 p. m., an American Airline Boeing 727 jet airplane, Flight No. 119, having originated in New York, left St. Louis, Missouri, bound for Tulsa, Phoenix, and Los Angeles. At about 3:15 p. m. and when approximately 20 minutes before planned arrival in Tulsa, the defendant, holding a machine gun, accosted one of the four stewardesses and gave her two notes to deliver to the captain. The notes in part demanded $502,000 cash, certain parachuting equipment, and the return of the flight to St. Louis.

The plane returned to St. Louis and landed at about 4:00 p. m. The women, children, and some men deplaned. The plane refueled and circled St. Louis, awaiting the collection of the money and the equipment. After the defendant was told that the money was not available in St. Louis but was in Fort Worth, Texas, the airplane headed for Fort Worth at 6:45 p. m.

At about 7:45 p. m., the captain was informed that the money could be collected in St. Louis, and the flight was redirected to St. Louis, where it landed at Lambert Field at 9:25 p. m. for the second time on June 23d. During this time on the runway, a male passenger retrieved the money and parachuting equipment outside the jet. The defendant then allowed all the original crew, except two stewardesses, to deplane; one male passenger was ordered to remain on board as a hostage. The new captain and crew, including a FBI agent disguised as a pilot, boarded the flight for a new destination.

With the relief crew in command, the same American Airlines Boeing 727 began to taxi for lift-off. In the process, however, a late model automobile, which had broken through the airport security gates, struck the airplane on its underside and disabled it. A private citizen, acting entirely on his own, drove the car about 90 miles per hour into the airplane. After several minutes of high tension and assurances that the FBI was not involved in this misdirected and unfortunate incident, arrangements were made for another American Airlines airplane, a Boeing 727 jet designated Flight No. 821, to accommodate the hijacker's demands. The entourage transferred to this plane, with the hijacker in control. He ordered the plane to proceed toward Canada. At 3 a. m. on June 24th, en route to Canada, traveling at 10,000 feet and 263 knots true air speed and located 43 miles west of Fort Wayne, Indiana, and five miles south of Peru, Indiana, the captain noticed a shift in air pressure according to certain instrumentation, a Transponder system, that indicated to him that the hijacker had parachuted from the airplane. The jet then turned around and eventually landed in Chicago without the hijacker.

From June 24th through June 28th, 150 FBI agents scoured the area around Peru for the hijacker. On one of those days, a farmer near Peru found the American Airlines' mail pouch containing over $500,000 and notified the FBI. Also discovered in the same area of open fields were a .45 caliber machine

gun, the parachute given to the hijacker, and clothes.

Operating on reliable information, the FBI continued its search in Wyandotte, Michigan, close to Detroit and the home of the defendant. On June 28th at about 11:00 to 11:30 p. m., the defendant was arrested in front of his home in Wyandotte. Agents, according to their testimony, surrounded the defendant's home and entered it at 2:45 p. m. on June 29th after a search warrant had been issued. They further testified at a hearing on a motion to suppress evidence that no one entered the home before 2:45 p. m. on June 29th, that lights inside the home did turn off once during the night before the search, and that a timing device that turns off lights automatically was found on the premises during the search. One neighbor testified that someone was inside the house during the early morning of June 29th, and another neighbor testified that the lights inside the house flickered off and on several times during the night. During the search, the agents found certain books and charts connected with aviation, a box of .45 caliber ammunition, a rifle stock, a metal foregrip for a .45 caliber machine gun, and a .45 caliber M–3 cartridge magazine. Over objection, these items were admitted as evidence during the defendant's trial.

The defendant moved at various times both before and during trial for a change of venue, sequestration of the jury, and exclusion or control of the press during trial. The District Court denied all of these motions.

Media coverage of this hijacking was extensive, as conceded by the Government. The Government stipulated that continuous radio coverage and spot television bulletins were broadcast during the evening of June 23d and early morning of June 24th. The record contains copies of the St. Louis Post-Dispatch, St. Louis Globe-Democrat, and the television news scripts of KSD–TV and KTVI–TV, all from June 23, 1972, through July 5, 1972. In addition, the Government has reprinted a November 15, 1972, St. Louis Post-Dispatch news article concerning the defendant's mental competency. The defendant has cited to us no articles published or newscasts broadcast *during* the trial that could be considered prejudicial.

Undoubtedly, this case attracted broad media attention at the time of the hijacking and subsequent search for the perpetrator. The hijacking of airplanes was indeed topical at this particular time. According to the St. Louis Globe-Democrat of June 24–25th (a combined Saturday-Sunday edition), the United States Attorney for the Eastern District of Missouri had four days earlier "blasted what he called 'appalling security' at Lambert Field." The St. Louis Post-Dispatch reported on Sunday, June 25th, that the Federal Aviation Administration had published on Saturday, June 24th, in the Federal Register that it was considering regulations requiring certain rewiring of Boeing 727 jets so that the rear door could not be opened during the flight. The rear door provides a safer exit for a parachuter and was employed by the defendant in this case. At the time of this hijacking, officials were beginning to implement security measures that are now prevalent in the airports across the country.

Despite the understandable emotionalism concerning hijacking during the summer of 1972, we find, in reading the newspaper articles and television news scripts, that the journalistic reporting was accurate, objective, and unemotional. Perhaps the very nature of the case aided the objective reporting. No injuries occurred during the hijacking; the hijacker himself was not known, but thought to be dead, for several days; and the FBI quickly apprehended the defendant. Unlike other cases concerning pretrial publicity, there is actually little to say or any prejudicial articles or newscasts to discuss concerning the handling of this incident by the media. The case did receive front-page coverage from June 24th through July 5th, however the reports were objective and certainly not prejudicial.

■ The Government and the District Court were acutely aware of the extensive coverage and took careful precautions to assure a fair trial. An enumeration of some of these precautions demonstrates that "the District Court carefully protected the defendant's rights. Without identifying the defendant by name, the District Court first asked all veniremen whether they knew the name of the defendant. Only one eventual juror could name the defendant and connect him with the hijacking, and she said that this would not affect her judgment of the guilt or innocence of the defendant. During *voir dire*, the District Court asked numerous questions, many supplied by defendant's counsel or defendant himself, concerning pretrial publicity generally, specific news articles, and television broadcasts. The 150 pages of *voir dire* transcript reveals that the District Court meticulously determined the effect of pretrial publicity on the veniremen. In addition, the court admonished the jury on many occasions to avoid entirely *any* media reports during the trial. The District Court stressed that "I can't emphasize too strongly this admonition." During the trial, there is no evidence of any irregularities concerning the conduct of reporters or photographers at the courthouse or in the courtroom. We can only rightfully assume that the courtroom atmosphere was conducive to the quiet consideration of the testimony and evidence.

A restatement in length of the legal principles involved in pretrial publicity cases serves little purpose in this case. Eventually each such case must be decided on the facts,[2] and ordinarily the defendant has the burden of showing any essential unfairness in the adjudicatory process unless the totality of the circumstances raises the probability of prejudice. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 542, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Adams v. United States ex rel. McCann, 317 U.S. 269, 281, 63 S.Ct. 236, 87 L.Ed. 268 (1942). Clearly, the defendant has failed to sustain the burden of showing prejudice; nor does the totality of the circumstances shows a probability of prejudice.

A trial before a fair and impartial tribunal is a basic requirement of due process. In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1965). We recognize and strongly support the general principles concerning publicity and a fair trial discussed in Sheppard v. Maxwell, *supra*. The press and all other media have the right—and, according to their own professional responsibilities, the duty—to report the factual happenings concerning a specific case and trial. Direct limitations on the press in this regard are not consonant with the First Amendment or a democratic society, which depends on the free flow of information for public scrutiny. The courts recognize that "[w]hat transpires in the court room is public property." Craig v. Harney, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947). However, counter-balanced against the right of the media to report and the public to know is the necessity to adjudicate civil and criminal controversies in an atmosphere of "judicial serenity and calm." Estes v. Texas, *supra*, 381 U.S. at 536, 85 S.Ct. 1628. Public passion and sensationalism through the media or otherwise is devoutly to be avoided, for as aptly phrased by Mr. Justice Holmes "[t]he theory of our system is that conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence. . . ." Patterson v. Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907).

Specifically, the District Court was well within its discretion in denying the motion for a change of venue. Under Fed.R.Crim.P. 21(a), the District Court,

2. Margoles v. United States, 407 F.2d 727, 733 (7th Cir.), cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 64 (1969).

in order to grant a change of venue, must be "satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district." First, the District Court properly conducted *voir dire* before denying the change of venue motion, since "[t]he ultimate question is whether it is possible to select a fair and impartial jury. . . . " Koolish v. United States, 340. F.2d 513, 526 (8th Cir.), cert. denied, 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724 (1965), *quoting* Blumenfield v. United States, 284 F.2d 46, 51 (8th Cir. 1960), cert. denied, 365 U.S. 812, 81 S. Ct. 693, 5 L.Ed.2d 692 (1961).

 Just because, however, there has been widespread or even adverse publicity is not in itself grounds to grant a change of venue.[3] As stated in Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961), an important case draws public attention through "swift, widespread and diverse methods of communication" and hardly any prospective juror "will not have formed some impression or opinion as to the merits of the case." The proper test is whether the prospective juror "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, *supra* at 723, 81 S.Ct. at 1643 (citations omitted) ; Koolish v. United States, *supra*, 340 F.2d at 527. Skyjacking is a national crime, not just a local atrocity and can affect persons from various areas of the country. Its occurrence is national or international news, the impact of which spreads far beyond the locale where the piracy occurred. In addition the piracy itself covers vast areas of the country.

██ Although a district court's findings in respect to the force of a prospective juror's opinion should not be set aside by a reviewing court unless the error is manifest,[4] it is our duty as an appellate court "to independently evaluate the *voir dire* testimony of the impaneled jury"[5] in order to determine whether an impartial jury was selected, thus obviating the necessity for a change of venue.

In reviewing the *voir dire* examination independently, we find several reasons to conclude that an impartial jury was impaneled. Eight prospective jurors were dismissed by the court, since they said for various reasons that they could not set aside preconceived opinions. Only one juror could connect the name of the defendant with the hijacker as reported in the media, and this juror said that this information would not affect her impartiality. In addition, the media reporting was objective, not the sensationalistic type present in the reporting of the original *Sheppard* trial. No such incident, as the televised "interview" of a defendant's confession,[6] compels us to conclude that the jurors selected on *voir dire* could not lay aside any impression or opinion formed from the objective news reports and render a verdict based on the evidence presented in court. *See* Irvin v. Dowd, *supra*, 366 U.S. at 723, 81 S.Ct. 1639, 6 L.Ed.2d 751.

██ One incident occurred during the reporting of this case that was regrettable. On November 6, 1972, during a hearing on motions, the District Court announced in part the findings of the Springfield Medical Center staff's report on the defendant's mental competency at that present time and the time of the alleged offense. A St. Louis Post-Dispatch reporter, who was not present at the hearing, received a copy

---

3. Irvin v. Dowd, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) ; Koolish v. United States, *supra*, 340 F.2d at 526.

4. Reynolds v. United States, 98 U.S. 145, 155, 25 L.Ed. 244 (1878), *quoted* with approval in Irvin v. Dowd, *supra*, 366 U.S. at 723, 81 S.Ct. 1639, 6 L.Ed.2d 751.

5. Irvin v. Dowd, *supra*, at 723, 81 S.Ct. at 1643.

6. Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

of that report, which was only partly admitted into evidence, from an assistant United States district attorney. An article appeared in the St. Louis Post-Dispatch on November 15, 1972, that included information not reported by the District Court in the hearing of November 6th. The publication of that part of the report not admitted at trial was an abuse of power by the press,[7] caused in part by the dereliction of the district attorney's office in furnishing to the press confidential medical information that had not totally or fully been admitted as evidence in this case. Still the press has a responsibility to verify the accuracy of its trial reporting. Once admitted the evidence becomes public property, but publication of inadmissible evidence complicates the administration of justice, infringes on personal and constitutional rights, and thwarts society's interest in holding a fair and impartial trial. The possible exposure of jurors to such information that is not admitted could lead to grounds for reversal. Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). However, the published article only slightly expanded on the District Court's statement of the staff's finding and cannot be seen as prejudicial.[8] Also, the District Court in the course of general questions concerning newspaper articles during *voir dire* examination learned that no juror remembered reading the November 15th article, which was published on page 19E of that edition. The most regrettable conduct was that of the assistant district attorney's, for the whole incident could have been avoided if he had not released the article in the first place. Articles of criminal proceedings should properly emanate from the record and not from putative documents leaked or proffered by the parties.

The defendant also moved for sequestration of the jury and exclusion and control of the press during the trial, but the defendant has cited to us no offensive or inflammatory publicity *during* trial that would require the implementation of these rare procedures. It is true that Sheppard v. Maxwell suggests the use of these courtroom procedures in certain cases; however, since we have been presented with no specific evidence concerning prejudicial publicity during trial, we can only conclude that the District Court properly denied sequestration of the jury and exclusion or control of the media. Margoles v. United States, *supra* at 735. As previously mentioned, the defendant has not related to us any incident concerning the misconduct of the media representatives within the courtroom, and we can only conclude that the trial was conducted in the quiet atmosphere of a deliberate tribunal.

We are convinced that an impartial jury was selected and that the District Court acted within its sound discretion[9] in denying the motions concerning pretrial and trial publicity. We have examined the media accounts presented to

---

7. Margoles v. United States, *supra*, 407 F.2d at 733.

8. In summarizing the psychiatric report from the Springfield medical staff, the news article said that McNally was of an "anti-social type." He "suffered from a severe personality disorder" and may have had "an underlying paranoid process which is not readily apparent at this time." McNally also told the staff that he was "a nice decent guy, easy going and easy to get along with and I consider myself a follower rather than a leader." In conclusion, the article also stated that the Springfield staff "decided unanimously that McNally was capable of aiding in his own defense." The article did not report the staff's conclusion as to McNally's mental responsibility at the time of the hijacking, which was mentioned by the District Court during the hearing on the motions. The article's statements on the "anti-social type," the "underlying paranoid process," and "a nice decent guy" were not mentioned by the District Court.

9. As noted in Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959), "The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. Holt v. United States, 218 U.S. 245, 251, 31 S.Ct. 2, 54 L.Ed. 1021."

us, the *voir dire* examination, and the law applied to this issue and conclude that the defendant received a fair trial comporting with due process.

Second, the defendant argues that the District Court abused its discretion by refusing to appoint a psychiatric expert of the defendant's choice and by appointing a psychiatrist of the court's choice. The defendant submitted the names of two psychiatrists, and the District Court, without any explanation that appears on the record, appointed a psychiatrist of its choice. During the summer of 1972, the defendant was examined according to 18 U.S.C. § 4244 at the Springfield Medical Center during a ninety day period. Although the staff there found that the defendant had a severe personality disorder, passive-aggressive type, they concluded that the defendant could understand the nature of the proceedings and the charges against him and assist in his defense. They also found that the defendant was legally competent and responsible at the time of the hijacking.

Upon defendant's motion for appointment of a psychiatrist of his choosing, the District Court appointed on November 14, 1972, a psychiatrist of the court's choice to aid the defendant in preparing an adequate defense.[10] The record does not disclose the report of that psychiatrist. Although the defendant's two choices for a psychiatrist were rejected by the court, counsel for the defendant stated during oral argument on appeal that one of the psychiatrists suggested by the defendant to the District Court did examine the defendant. Although the results of that examination are not known by this court the defendant did not present a defense of mental incompetency at the trial.

The defendant claims that United States v. Matthews, 472 F.2d 1173 (4th Cir. 1973), demands that the District Court must appoint an expert of the defendant's choice under 18 U.S.C. § 3006A when the defendant offers a choice of at least two independent experts to the court. *Matthews* lays down no such absolute commandment. Although that court did say that the psychiatrist preferred by the defendant should be selected by the court unless some reason exists for making an independent choice, the court continued to say that "[w]e do not hold that the district judge must *always* appoint a psychiatrist chosen by the defendant, but we think he should ordinarily do so." United States v. Matthews, *supra* at 1174.

This Circuit has not faced this precise question under § 3006A raised by the defendant. In United States v. Maret, 433 F.2d 1064 (8th Cir. 1970), cert. denied, 402 U.S. 989, 91 S.Ct. 1678, 29 L. Ed.2d 155 (1971), a similar case, the majority determined the issue to be whether a third psychiatric examination by an independent source and at government expense was necessitated by 18 U. S.C. § 4244. The majority answered in the negative and held that "[w]hether an additional psychiatrist should be appointed . . . is within the sole discretion of the trial court."[11] Judge Lay dissented, holding that Maret should have had the benefit of independent psychiatrist's services under 18 U.S.C. § 3006A, because the defendant's mental competency at the time of the alleged offense had never been professionally evaluated and because Maret was unable to pay for those services.

In this case, the defendant's competency at the time of the hijacking and at that present time had been evaluated by the Springfield Medical Center staff. In addition, the District Court ordered an independent psychiatrist aforementioned to evaluate the defendant's competency at the time of the offense. The new issue here presented that was not

---

10. Section 3006A(a)(4) of Title 18 United States Code provides for the appointment of experts to aid an "indigent" defendant in presenting an adequate defense.

11. United States v. Maret, *supra* at 1067.

faced in *Maret* is whether 18 U.S.C. § 3006A requires the appointment of a psychiatric expert of the defendant's choice.

Another Eighth Circuit case, United States v. Schultz, 431 F.2d 907 (8th Cir. 1970), does not aid in the resolution of the present issue, since the defendant in that case was denied the benefit of *any* psychiatric examination under 18 U.S.C. § 3006A and of his competency at the time of the offense.

■■ The district court should have wide discretion in appointing experts under § 3006A to aid a defendant in preparing and presenting an adequate defense. Many factors and varying circumstances enter into the selection of an expert, who might be called upon to give opinion testimony in court. Although the appointment of an expert of defendant's choice may be appropriate in many instances, the District Court should not be restricted by defendant's personal selection. We think the District Court operated well within its discretion in appointing a psychiatrist of its own choice to determine defendant's mental responsibility at the time of the hijacking. No error resulted from the District Court's refusal here to appoint a psychiatrist of defendant's choice. In any event, the defendant had the benefit of an examination by a psychiatrist of his own choice.

■ Third, the defendant argues that evidence seized in the search of his home should have been suppressed, since the search in part allegedly occurred before the issuance of the search warrant at 2:45 p. m. on June 29, 1972. He posits this argument on the factual contentions that one neighbor saw lights in the house go off more than once during the night, and another neighbor saw someone in the house at about 7:00 a. m. on June 29th. From this he syllogizes that the agents, who had secured the house during the night and next day, must have entered the house before the issuance of the search warrant.

The Government admits that the lights went off once during the night, since a special agent did so observe. However, the Government contends that no agent or anyone else entered the house before the agents searched the home after the issuance of the warrant, and, in addition, points out that an automatic timing device which turns light off and on automatically, was found during the search of the defendant's home.

In Miller v. United States, 354 F.2d 801 (8th Cir. 1966), this court faced the similar issue of whether an arrest warrant had been issued before a search. *Miller* held that the district court "alone is responsible for fact determinations and conclusions to be drawn therefrom,"[12] and that the credibility of witnesses during a motion to suppress hearing is for the determination of the district court. Miller v. United States, *supra* at 808; *accord*, Gullet v. United States, 387 F.2d 307, 309 (8th Cir.), cert. denied, 390 U.S. 1044, 88 S.Ct. 1645, 20 L.Ed.2d 307 (1967). A reviewing court will not reverse such determinations by the district court so long as there is substantial evidence to support the conclusions reached and no clear error appears on the record. Gullet v. United States, *supra* at 309.

The District Court here chose to believe the testimony of several agents concerning the time that the agents entered the defendant's house. We affirm that finding, since it was within the province of the District Court to determine the credibility of witnesses. Substantial evidence supports the denial of the motion to suppress and no clear error appears on the record.

■ Last, the defendant contends that 49 U.S.C. § 1472(i) allows the imposition of the death penalty and, therefore, he should have been allowed 20 peremptory challenges as provided by Fed.R.Crim.P. 24(b). Prior to trial, the

---

12. Miller v. United States, *supra* at 805.

District Court ruled that Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972),[13] made the imposition of the death sentence impossible. The Government during the trial stated that the death penalty was not applicable to this case. In reading 49 U.S.C. § 1472(i) to the jury as part of the court's charge, the District Court omitted §§ (i)(1)(A) and (B), which mentioned the imposition of the death sentence upon recommendation of the jury. Therefore, the jury only returned a verdict of guilty on the two charged counts and did not recommend the death sentence. The Government did not contend at trial or on appeal that a death sentence was permissible under *Furman* in this case, and accordingly we do not decide that issue. The plural opinions filed by the majority in *Furman*, constituted a sound basis for the District Court's conclusion that the death penalty could not be sought in this case. In addition the Government acquiesced in that ruling.

It is somewhat ironic that the defendant would complain that he should have been allowed the benefits of the added peremptory challenges, since his case conceivably could have been submitted as a capital case, subject to a death penalty. In fact, he is indirectly asking us for a reversal of this case so that he may have the benefits of a capital case prosecution, with the added disadvantage of a possible death sentence if retried. Leaving well enough alone in this case

seems to be in order for such strategical appellate arguments.

Nevertheless, Loux v. United States, 389 F.2d 911 (9th Cir.), cert. denied, 393 U.S. 867, 89 S.Ct. 151, 21 L.Ed.2d 135 (1968), presents a similar issue that disposes of the defendant's argument. Although *Loux* said that "the possibility of an imposition of a death penalty under the indictment . . . determines if the accused is entitled to the procedural benefits available in capital cases,"[14] the court also held that the prosecution lost its "capital nature" when the district court held and the Government agreed that a death sentence would be inappropriate. *Accord*, Holt v. United States, 410 F.2d 653, 660 (4th Cir.), cert. denied, 396 U.S. 970, 90 S.Ct. 455, 24 L.Ed.2d 436 (1969).

Although the indictment did charge an offense that allowed the imposition of a death sentence, the District Court interpreted *Furman* to make such a sentence impossible. The Government did not contest this interpretation, and for obvious reasons at trial, the defendant did not complain. In addition, the District Court did not charge the jury that they could recommend the death sentence; nor did the Government argue for the death penalty. Under these circumstances, the case lost its capital nature as charged in the indictment, and the defendant was not improperly denied the benefits of Fed.R.Crim.P. 24(b), calling for 20, instead of 10, peremptory challenges.

Judgment of conviction affirmed.

---

13. That decision was issued on June 29, 1972, the day after the defendant was arrested and the same day that his pictures first appeared in the newspapers.

14. Loux v. United States, *supra* at 915, *quoting* Amsler v. United States, 381 F.2d 37, 45 (9th Cir. 1967).