Norman J. MASTRIAN,
Petitioner-Appellant,

v.

Bruce W. McMANUS, Warden, Minnesota
State Prison, Respondent-Appellee.

No. 76–1427.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 8, 1976.

Decided April 5, 1977.

Certiorari Denied June 27, 1977.
See 97 S.Ct. 2985.

Jack S. Nordby, St. Paul, Minn., for appellant.

Steven C. DeCoster, Asst. Ramsey County Atty., St. Paul, Minn., for appellee; Warren Spannaus, Atty. Gen., William B. Randall, Ramsey County Atty., St. Paul, Minn., on the brief.

Before GIBSON, Chief Judge, and HEANEY and HENLEY, Circuit Judges.

HEANEY, Circuit Judge.

Norman Mastrian was charged by indictment with the murder of Carol Thompson.[1] He was granted a change of venue from St. Paul to Duluth, Minnesota, tried in the latter city and convicted of first degree murder. His motions for a judgment of acquittal or for a new trial, for arrest of judgment, and for a new trial based on newly discovered evidence were each denied in post-trial orders by the state district court. The Minnesota Supreme Court affirmed the judgment of conviction and the denials of his several motions. *State v. Mastrian,* 285 Minn. 51, 171 N.W.2d 695, *cert. denied,* 397 U.S. 1049, 90 S.Ct. 1381, 25 L.Ed.2d 662 (1969).

By petition for writ of habeas corpus to the federal District Court for the District of Minnesota, Mastrian alleged several violations of his constitutional rights: first, that prejudicial publicity and attendant errors of the court denied him a fair trial by an impartial jury; second, that he was preju-

diced by his illegal arrest; third, that the two-year delay by the federal District Court in hearing his petition effectively violated his right to habeas corpus; and fourth, that the totality of constitutional and nonconstitutional errors committed before and during trial amounted to a denial of due process. In addition, he urged that he was entitled to a new trial based on newly discovered evidence. On appeal, he raises each of the claims asserted in his petition for habeas corpus. We are convinced that the District Court properly denied each of these claims.

I. *The Prejudicial Publicity and Its Consequences.*

Mastrian argues that massive publicity in the news media attending both the Thompson trial[2] and his own prevented the impanelling of an impartial jury and otherwise denied him of a fair trial. Mastrian raises three subarguments: first, that massive *pretrial* publicity made it impossible to impanel an impartial jury and prevented him from receiving a fair trial; second, that publicity before and during trial was such that the trial court erred in denying his motion to sequester the jury; and third, that remarks by the court during the course of the trial aggravated damage done by the prejudicial publicity and required the accused to prove his innocence.

█ Before addressing these subarguments, we acknowledge the importance of arriving at a fair balance between the constitutional right of the accused to be tried only on the evidence and argument presented at trial, *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3

---

1. Her husband, T. Eugene Thompson, was charged and convicted of first degree murder resulting from the same homicide. His conviction was affirmed on appeal. *State v. Thompson,* 273 Minn. 1, 139 N.W.2d 490, *cert. denied sub nom. Thompson v. Minnesota,* 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966).

2. The Thompson trial commenced on October 28, 1963, and ended on December 6, 1963.

Mastrian was brought to trial on February 17, 1964. The Thompson case was clearly the more notorious of the two trials. It attracted media attention throughout much of 1963. *See State v. Thompson, supra* at 139 N.W.2d 513–515; *State v. Thompson,* 266 Minn. 385, 123 N.W.2d 378, 380–381 (1963).

L.Ed.2d 1250 (1959); *In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *Patterson v. Colorado,* 205 U.S. 454, 27 S.Ct. 556, 51 L.Ed. 879 (1907), and the constitutional guaranty that the press be allowed to report what transpires in the courtroom. *Sheppard v. Maxwell, supra; Craig v. Harvey,* 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1967); *Bridges v. California,* 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941). A democratic society is served by an active and aggressive press which subjects the police, prosecutors and judicial processes to extensive public scrutiny and criticism. *Sheppard v. Maxwell, supra.* For this reason, courts have been unwilling to impose any direct limitations on the press's reportorial function. But when excesses in press coverage of controversial trials have threatened the accused's right to an impartial jury, courts have been quick to grant appropriate remedies. *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). *See Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (Black, J., dissenting); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). With this in mind, we turn to Mastrian's contention regarding pretrial publicity.

(a) *The impact of pretrial publicity.*

■ The record before this Court demonstrates that there was substantial pretrial publicity in the Minneapolis-St. Paul area. Thompson was tried there and his trial generated considerable publicity. Mastrian was scheduled to be tried there before his change of venue motion was granted. The record also reveals that information respecting Mastrian's prior convictions and arrests was released to the Twin Cities media by law enforcement officials, along with statements as to his guilt.

Mastrian's first argument is that the quantity and nature of pretrial publicity denied him a fair trial as a matter of law. He also claims that both the release of prior convictions and arrest information and the published statements on his guilt by enforcement officials violated ABA standards relating to fair trial and free press.[3] He urges that we condemn such practices by the giving the standards the force of law and granting him a new trial.

In our view, adequate steps were taken to mitigate the potentially harmful effects of each of the violations Mastrian alleges. Media coverage in the Duluth community was restrained in comparison to other cases in which the Supreme Court has granted new trials. *Compare Sheppard v. Maxwell, supra; Estes v. Texas, supra.* See also *Marshall v. United States, supra; Bridges v. California, supra.* The record reveals that the bulk of the unfavorable media attention occurred in the Twin Cities area. Most of this publicity occurred between April and September of 1963. Jury selection was delayed until February, 1964. This time lapse probably helped dissipate the impact of some unfavorable publicity. But of far greater significance is the fact that the trial venue was changed to Duluth, Minnesota, some 150 miles from the Twin Cities area and substantially outside of its media coverage. This factor alone serves to distinguish Mastrian's situation from that of Dr. Sheppard in that the latter's trial was held in the same location where the unfavorable publicity occurred.

The same can be said with respect to the statements of enforcement officials and the release of prior conviction and arrest information. While we think law enforcement officials should prospectively adhere to the quoted ABA standards, we cannot at this time fault them or the press for failing, in 1963 and 1964, to follow standards not yet articulated. Such violations as might have

---

**3.** American Bar Association's *Standards Relating to Fair Trial and Free Press* (1968 Draft) condemn comments upon

The prior criminal record (including arrests, indictments, or other charges of crime) or the character or reputation of the defendant [.]

The defendant's guilt or innocence or other matters relating to the merits of the case [.]
The * * * refusal or failure of the defendant to make any statement [.]
The identity, testimony, or credibility of prospective witnesses [.]

occurred do not so offend constitutional due process that we should hold as a matter of law that these violations require the voiding of Mastrian's conviction. By and large, the statements were made by enforcement officials in Ramsey County and were released to the Twin Cities media. Their impact was mitigated by the same steps the trial court took to deal generally with adverse pretrial publicity.

■ Mastrian's next argument is that the Duluth area itself was so infected by pretrial publicity that an impartial jury could not be chosen. He points to the fact that forty-two percent of those examined for jury duty admitted to having an opinion as to his guilt and that all twelve jurors chosen had read about the case. The existence of prejudice among some voir dire examinees or the fact that many have read about the case is not conclusive evidence that an impartial jury cannot be found. It is not necessary that the jurors be totally ignorant of the facts and issues involved. *Irvin v. Dowd, supra*, 366 U.S. at 722, 81 S.Ct. 1639. With our present methods of communication, it is unlikely "any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin v. Dowd, supra* at 722–723, 81 S.Ct. at 1642. The test is whether a prospective juror "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Murphy v. Florida, supra* 421 U.S. at 800, 95 S.Ct. at 2036, *quoting with approval from Irvin v. Dowd, supra*, 366 U.S. at 732, 81 S.Ct. at 1643. *See United States v. Woods*, 486 F.2d 172, 174 (8th Cir. 1973); *United States v. McNally*, 485 F.2d 398, 403 (8th Cir. 1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1566, 39 L.Ed.2d 874 (1974). Although we may not set aside the trial court's finding on the issue of juror impartiality unless error is manifest, we are required to independently evaluate the voir dire testimony of the impanelled jurors. *Murphy v. Florida, supra*, 421 U.S. at 800, 95 S.Ct. 2031; *Irvin v. Dowd, supra*, 366 U.S. at 723, 81 S.Ct. 1639.

■ The record shows that nearly half of the ninety-two veniremen called for duty either had not formed an opinion as to Mastrian's guilt or claimed they could remain impartial. Each of those chosen for jury duty claimed during voir dire to have no present opinion as to Mastrian's guilt. Thus, the facts of this case are readily distinguishable from those in *Dowd* where eight of the twelve jurors chosen admitted during voir dire that they thought the defendant was guilty. Moreover, we think it of some import that Mastrian's counsel did not exercise all of his peremptory challenges during voir dire and did not move to dismiss the chosen jurors either after jury selection was completed or during trial. *Compare Murphy v. Florida, supra*, 421 U.S. at 800, 95 S.Ct. 2031.

In summary then, we do think that adequate steps were taken to mitigate the effects of both the extensive publicity in the Minneapolis-St. Paul area and the violations of the incipient ABA standards. That these steps were successful is reflected by the fact that each of the twelve jurors stated that he had no opinion as to Mastrian's guilt.

(b) *Sequestration issue.*

Our holding that an impartial jury was impanelled at the commencement of petitioner's trial does not determine the issue of whether those jurors were infected by prejudicial publicity during the course of the trial. Mastrian argues that the trial court should have sequestered the jury and that its failure to do so denied the petitioner a fair trial.

■ The decision to sequester lies within the sound discretion of the trial court. *United States v. McNally, supra; Margoles v. United States*, 407 F.2d 727 (7th Cir.), *cert. denied*, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969); *Koolish v. United States*, 340 F.2d 513 (8th Cir.), *cert. denied*, 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724 (1965). We find no abuse of that discretion here. Mastrian directs our attention to no offensive or inflammatory publicity during trial that would require implementation of

this rare procedure.[4] *See United States v. Woods, supra* at 174; *United States v. McNally, supra* at 404. Although a pretrial request for sequestration was made, that request was not renewed during trial nor did defense counsel bring prejudicial stories to the court's attention and ask that the jury be polled with respect to them.[5] *Compare Sheppard v. Maxwell, supra*, 384 U.S. at 345–349, 86 S.Ct. 1507. Moreover, the trial court repeatedly admonished the jurors to ignore all publicity they might encounter during trial and to avoid talking about the trial with anyone. We approved this approach in the *Koolish* case. *Koolish v. United States, supra* at 528–529.

The procedure of sequestration is one of the most burdensome tools of the many available to assure a fair trial. It necessarily narrows the cross section from which a jury is drawn by eliminating those persons for whom a lockup would be prohibitive. In this case, the steps taken to mitigate adverse pretrial publicity, together with the trial court's cautionary instruction, were adequate to protect Mastrian's right to an impartial jury.

### (c) *The court's pretrial instruction.*

■ After jury selection was completed but before any evidence was taken, the trial judge instructed the jury to avoid any publicity which they might encounter during the trial. During the course of this instruction, the court made the following statement:

4. With respect to the existence of prejudicial publicity during Mastrian's trial, the Minnesota Supreme Court commented:
    Although the record and defendant's argument convincingly demonstrate the existence of prejudicial pretrial publicity, there is scant proof that the jurors selected continued to be exposed to the same type of publicity or that the trial publicity was so unfavorable to the accused that the jurors could not realistically be expected to remain impartial.
    *State v. Mastrian*, 285 Minn. 51, 171 N.W.2d 695, 707, *cert. denied*, 397 U.S. 1049, 90 S.Ct. 1381, 25 L.Ed.2d 662 (1969).
    Similarly, the magistrate's report to the District Court found that "petitioner has cited no inflamatory or offensive publicity during trial that would require sequestration of the jury."

This is a sad commentary, that 92 people were brought in here and only 14 of you were selected. It is a sad commentary of our judicial system that a man can be convicted or acquitted of a charge before the evidence is produced in court. And God help any of us that may find ourselves in a position and be innocent, that because of the undue publicity, that we would be convicted of something before we have had a chance to enter the court and tell our side of the story.

Mastrian argues that this statement violated his right against self-incrimination, both because it implied that he would take the stand and because it shifted the burden of proof to the defense. These are several reasons why we must reject each of these contentions. First, counsel for Mastrian raised no objection at the time this particular statement was made or at the conclusion of the court's instruction. No motion for mistrial was made. Furthermore, we are satisfied that each juror understood that it is the government's burden to prove the defendant's guilt beyond a reasonable doubt. The record shows that Mastrian's counsel questioned each juror extensively on his or her understanding of the presumption of innocence and burden of proof. Finally, we believe the quoted passage, when read in conjunction with the rest of the court's cautionary instruction, is not misleading. It is highly unlikely that the jury isolated this particular passage from the court's lengthy instruction and drew the inferences Mastrian suggests.

5. It is more than a procedural concern that requires that prejudicial stories be brought to the court's attention promptly on discovery by counsel. With publicity in hand, the court may poll the jury, instruct them to ignore the article or order them sequestered to avoid further prejudice to the defendant. If the court's attention is not promptly directed to the prejudicial matter, the efficacy of these measures may be lost.
    Although the *Sheppard* case is admittedly an extreme situation, it is significant, in our view, that the Supreme Court took some trouble to detail each instance in which Dr. Sheppard's counsel brought a particular article to the court's attention and requested a jury poll. *See Sheppard v. Maxwell, supra* at 345–349, 86 S.Ct. 1507.

## II. *Illegal Arrest.*

On April 19, 1963, at approximately 3:00 A.M., Mastrian was placed under arrest at his Spring Lake Park residence by officers of the St. Paul Police Department. This arrest was accomplished by forcible entry into his home after the officers had identified themselves and been refused entry. No warrant was issued for his arrest. At a hearing the same day in St. Paul Municipal Court, Mastrian attacked the legality of the officers' warrantless arrest, but his motion was denied on the ground that he had failed to carry his burden of proving lack of probable cause.[6] On May 8, he was indicted by a Ramsey County jury.

Mastrian asserts that his warrantless arrest was illegal[7] and that this Court must decide whether the adverse consequences flowing from that arrest were harmless beyond a reasonable doubt.

Mastrian admits, and the state court found,[8] that no evidence or incriminating statements obtained as a consequence of the arrest were admitted at trial. Thus, his conviction was not prejudiced in this way. *See Collins v. Swenson,* 443 F.2d 329 (8th Cir. 1971); *United States v. Turner,* 442 F.2d 1146 (8th Cir. 1971); *Sewell v. United States,* 406 F.2d 1289 (8th Cir. 1969); *Theriault v. United States,* 401 F.2d 79 (8th Cir.), cert. denied, 393 U.S. 1100, 89 S.Ct. 898, 21 L.Ed.2d 792 (1969). The question remains whether other adverse consequences flowed from the alleged unlawful arrest. Mastrian claims the following adverse consequences: first, the nighttime arrest generated considerable prejudicial publicity; second, the incarceration which resulted from the arrest prevented him from adequately preparing his defense; and third, conferences with his attorney while incarcerated were overheard by a fellow inmate.

We believe the preceding discussion on prejudicial publicity adequately dispenses with Mastrian's first contention. Neither the publicity caused by the unlawful arrest nor the coverage that continued throughout the pretrial period denied Mastrian a fair trial.

In regard to Mastrian's second contention, we note that his illegal detention, assuming it was illegal, lasted only nineteen days.[9] The strength and thoroughness of his defense, as reflected in the trial record, belies the argument that this delay in some way prejudiced the preparation of his case. Mastrian identifies no way specifically in which his preparation was hindered. Absent such a showing, we conclude that any injury Mastrian suffered was harmless.

Mastrian's final arrest-related assertion, that conversations with his attorneys were monitored by another inmate, presents a more serious constitutional claim. The Sixth Amendment secures for the accused the right to have the assistance of

---

6. The Minnesota Supreme Court in *State v. Mastrian, supra* at 171 N.W.2d 695, held that the municipal court's ruling which placed the burden of proving no probable cause on the petitioner was clearly erroneous. The court stated:

    Any arrest made without a warrant, if challenged by the defendant, is presumptively invalid, and the burden is upon the state to justify it as one not only authorized by § 629.34 but also as one not violative of the guarantee of the Fourth Amendment.

    *Id.* at 699.

7. The Supreme Court recently stated that it has not yet decided "whether there are any circumstances in which an officer may enter a suspect's home to make a warrantless arrest." *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

8. *State v. Mastrian, supra* at 171 N.W.2d 700.

9. Our reasoning is dependent upon the Supreme Court's decision in *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972). There, the defendant sought to have his lineup identification excluded at trial. He argued that his presence in the lineup was the fruit of a primary illegality—his warrantless nighttime arrest. The Court held that because Johnson was brought before a magistrate prior to the lineup, his detention at the time of identification was under the authority of the commitment procedure which cleansed the subsequently taken lineup evidence from the taint of the warrantless arrest.

    Mastrian was arrested on April 19. He was indicted by a Ramsey County grand jury on May 8, some nineteen days after the arrest. At this point, he came within the lawful authority of the state courts.

counsel in his defense. It is clear "that an accused does not enjoy the effective aid of counsel if he is denied the right of private consultation with him." *Coplon v. United States,* 89 U.S.App.D.C. 103, 191 F.2d 749, 757 (1951). *See Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *United States v. Rosner,* 485 F.2d 1213 (2nd Cir. 1973), *cert. denied,* 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974); *United States v. Brown,* 484 F.2d 418 (5th Cir. 1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974); *Caldwell v. United States,* 92 U.S.App.D.C. 355, 205 F.2d 879 (1953). Evidence that a party monitored the accused's conversations with his attorney does not necessarily establish a Sixth Amendment violation. Rather, the accused must show, in addition, that the substance of the overheard conversation was of some benefit to enforcement officials.[10] Absent this proof, a monitoring allegation must be denied.[11]

During the trial of this case, two witnesses testified that they saw Sheldon Morris[12] eavesdrop on conversations between Mastrian and his attorneys at the Ramsey County Jail. There was no evidence in the record, however, showing that Morris was acting as an agent for enforcement authorities or that he ever communicated the substance of those conversations to them. Mastrian merely alleges that Morris communicated frequently with officials in the Ramsey County Attorney's office. Without more, this showing is insufficient to establish the required nexus between Morris's actions and some benefit to the prosecuting authorities. Therefore, we must deny Mastrian's claim.

III. *The Claim that Delay by the District Court in Hearing His Petition Violated His Right to Habeas Corpus.*

Although nearly two years passed before Mastrian's petition was decided, we cannot agree that his constitutional right to habeas corpus was violated. Several factors contributed to the delay; some were within Mastrian's control. Mastrian attempted, without success, to have the petition heard in a district other than Minnesota. His appeal of that unsuccessful effort was denied by this Court, *Mastrian v. Cudd,* Civil No. 74–8162 (8th Cir. Oct. 25, 1974), and by the United States Supreme Court, *Mastrian v. Cudd,* 420 U.S. 945, 95 S.Ct. 1340, 43 L.Ed.2d 432 (1975). Furthermore, the judge originally assigned to the case resigned from it shortly thereafter. The next judge assigned to the case removed himself at Mastrian's request. At the time of this removal, no other judge in the District of Minnesota was available to hear the case. The Chief Judge had recently decided Thompson's habeas corpus petition and properly refused to hear Mastrian's petition

---

10. This seems to be the position taken recently by the Supreme Court in *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). There, Weatherford, an undercover agent, sat in on two pretrial meetings between Bursey and his counsel. Weatherford's presence was requested by Bursey's counsel for the purpose of securing information and otherwise aiding in his defense. The Court held that the Sixth Amendment right to counsel does not establish a *per se* rule forbidding an undercover agent to meet with defendant's counsel. Rather, the defendant must show that details of the conversations were communicated to enforcement officials and that this information was used by them in some way. The Court did indicate, however, that any use at all by enforcement officials of the overheard matter would constitute a Sixth Amendment violation. *Weatherford v. Bursey, supra* at 552–553, 97 S.Ct. 837.

11. *See United States v. Rosner,* 485 F.2d 1213 (2nd Cir. 1973), *cert. denied,* 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974). In *Rosner,* a codefendant participated in strategy conferences between defendant and his counsel. The defendant's Sixth Amendment allegation was denied because there was no showing that the codefendant had acted as an agent for or turned over evidence to the prosecuting attorneys.

12. Morris testified for the state at Mastrian's trial and later pled guilty to bring an accessory after the fact in the Thompson murder.

because of the potential prejudice to the latter's claims. The fourth judgeship in the district was vacant, awaiting the confirmation and swearing in of a new appointee. After this position was filled and the case assignment completed, the time taken to decide it was not inordinate in light of the number of issues raised and the complexity of the proceedings at the state court level.

## IV. The Newly Discovered Evidence and Alleged Promises of Leniency.

Nearly three months after Mastrian's conviction, a letter was taken from the prosecution's star witness, Dick W. C. Anderson, in which he recanted most of his trial testimony incriminating Mastrian and Thompson. He stated that he had not been hired to murder Carol Thompson, but that he had been forced to kill her when she discovered him during a burglary of the Thompson home. He claimed that Sheldon Morris arranged the burglary and that Richard Sharp, Willard Ingram and Henry Butler [13] were aware of their plans. In addition, Anderson stated that the Ramsey County Attorney had promised to accept a plea to second degree murder if Anderson implicated Thompson and Mastrian. He was told that similar deals were being arranged for Morris, Ingram, Sharp and Butler. In a sworn statement on July 8, 1964, Anderson confirmed the substance of his July 5th letter.

Based on this letter and the corroborating deposition, the Minnesota Supreme Court remanded the case to Hennepin County District Court for a hearing on Mastrian's new trial motion. At the hearing, Anderson denied the bulk of his recanting letter and reaffirmed his trial testimony. He testified that the portion of his recantation dealing with the involvement of Thompson and Mastrian was the product of threats to his

life made by inmates at Stillwater State Prison. The trial court agreed that the recantation was the product of coercion and denied the new trial motion. The Minnesota Supreme Court affirmed. State v. Mastrian, supra at 171 N.W.2d 708.

In his habeas corpus petition, Mastrian argued: first, that the newly discovered evidence exonerates the accused and totally discredits all of the state's direct evidence and, second, that the state's witnesses were induced to testify by promises of leniency and that the prosecuting authorities failed to disclose this fact to the jury. The District Court denied both claims and Mastrian raises each on appeal.

Respecting the newly discovered evidence contention, both the trial court and the Minnesota Supreme Court found that Anderson's recantation [14] was the product of coercion and, thus, not credible. Mastrian seems not to contest this finding, but does argue that Anderson's new trial hearing testimony corroborated his recanting statements in several respects—most notably that he was acquainted with state witnesses Sharp, Ingram and Butler. At trial, he denied knowing any of them prior to the Thompson murder. Neither the trial court nor the State Supreme Court considered this evidence during Mastrian's new trial motion.

Although the claim of newly discovered evidence relevant to the guilt of a state prisoner is generally not a ground for relief on federal habeas corpus, Townsend v. Sain, 372 U.S. 293, 317, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); see generally Developments in the Law: Federal Habeas Corpus, 83 Harv.L.Rev. 1038 (1970), in the interests of judicial economy we believe its prudent to address the contention here. In federal court, the impact of recanted testimony as a basis for a new trial motion

---

**13.** Sharp, Ingram and Butler testified as state's witnesses in the Mastrian trial. Sharp was charged with the crime of burglary; Ingram and Butler pled guilty to attempted robbery in the first degree. The prosecution showed that the gun which Sharp gave to Mastrian was stolen in a burglary in which Ingram, Butler and Sharp participated.

**14.** Here, we are concerned only with that portion of the recantation which relates to Mastrian's involvement in the Thompson murder. However, both courts held that the entire recantation was not credible.

depends both on the credibility of the recanting witness and the materiality of his testimony. Unless the recanted testimony would probably produce an acquittal on retrial, a new trial motion on this ground must be denied. *United States v. McWilliams*, 421 F.2d 1083 (8th Cir.), *cert. denied*, 397 U.S. 1070, 90 S.Ct. 1515, 25 L.Ed.2d 694 (1970); *Batsell v. United States*, 403 F.2d 395 (8th Cir. 1968), *cert. denied*, 393 U.S. 1094, 89 S.Ct. 865, 21 L.Ed.2d 785 (1969); *Anderson v. United States*, 369 F.2d 11 (8th Cir. 1966), *cert. denied*, 386 U.S. 976, 87 S.Ct. 1171, 18 L.Ed.2d 136 (1967); *Edwards v. United States*, 361 F.2d 732 (8th Cir. 1966); *McCroskey v. United States*, 339 F.2d 895 (8th Cir. 1965). Even assuming that Anderson's recanting testimony was credible, we fail to see how the fact that Anderson knew of Sharp, Ingram and Butler prior to the Thompson murder substantially improves the defense's case. No doubt this fact adds something to the defense's burglary theory, but it is not so probative as to "probably produce an acquittal" on retrial. *Batsell v. United States, supra* at 403.

Mastrian also alleged that several witnesses for the state were induced to testify by promises of leniency from the prosecuting authorities. At the new trial hearing, Anderson stated that both Morris and Ramsey County Attorney Randall led him to believe that he would be allowed to plead guilty to second degree murder if he testified against Mastrian and Thompson. He also maintained that Randall promised to limit his imprisonment to five or six years if he were elected Governor or Attorney General of Minnesota. Finally, Anderson testified that Morris, Sharp, Ingram and Butler believed they would receive leniency in exchange for their testimony.

Mastrian's claim that promises were extended and not revealed depends almost entirely [15] on Anderson's testimony. There is considerable evidence in the record indicating that the alleged promises were not made. By affidavit, Ramsey County Attorney Randall stated that no promises of any sort were extended. Others testified to the County Attorney's unwillingness to bargain for testimony. In fact, Mastrian himself admits that the evidence is contradictory, but contends that the conflicting evidence should have been presented to the jury. We cannot agree. Considering Anderson's credibility and the strong evidence that promises were not extended, we think this newly discovered evidence would not produce an acquittal on retrial. *United States v. McWilliams, supra; Batsell v. United States, supra.*

In the alternative, Mastrian argues that a crucial witness's expectation of leniency must be revealed to the jury regardless of whether there is proof that a promise raised the expectation. The decisions on which Mastrian relies, *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), turn on the very factor which he discounts. In both cases, there was no conflict as to the existence of the unlawful promises. In each case, the prosecuting authorities admitted at a post-conviction hearing that a promise of leniency was made and not revealed. *See Giglio v. United States, supra*, 405 U.S. at 152, 92 S.Ct. 763; *Napue v. Illinois, supra*, 360 U.S. at 267, 79 S.Ct. 1173. In *Giglio* and *Napue*, the evil which concerned the Court was the misconduct of the prosecuting authorities in failing to reveal known evidence to the jury. We do not read these cases to support Mastrian's claim that a crucial witness's expectation of leniency must be revealed absent evidence of an express or implied promise.[16] Since the evidence here

---

**15.** Mastrian contends that Morris, Sharp, Ingram and Butler were treated leniently and that this fact indicates that promises of leniency were made and kept. The burden lies on Mastrian to establish the existence of the promises and based on the record before us, we cannot

say that the treatment they received shows that promises were extended.

**16.** We believe Mastrian misconstrues a particular passage from *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), which he quotes in support of his argument

does not persuade us that promises of leniency were in fact extended, we cannot grant Mastrian's relief.

## V. The Claim that All Errors, Taken Cumulatively, Denied Due Process.

A number of nonconstitutional errors were committed during the course of Mastrian's trial. Without explaining each in detail, we agree with the comments of the Minnesota Supreme Court: namely, (1) that the procedure followed in selecting grand jury members was "irregular;" [17] (2) that the county attorney was without authority to tape-record grand jury testimony for his own use; [18] (3) that the county attorney's office should have provided a more detailed indictment; [19] (4) that there were "unexcused variations" from the statutory petit jury selection procedure; [20] and (5) that the trial court erred in permitting the state to exercise a preemptory challenge after jury selection was completed. [21] Reciting these and other alleged errors, [22] Mastrian argues that even if no single error is sufficient to warrant reversal, the cumula-

tive effect of all errors, both constitutional and nonconstitutional, denied him due process of law. He relies chiefly on two Supreme Court decisions under the Due Process Clause. In both, convictions were overturned because police practice used in obtaining crucial evidence outraged the Court. [23]

Here, the errors complained of are not nearly so offensive to fundamental concepts of due process and fair law enforcement practices. The errors did not involve a forcible invasion of Mastrian's bodily privacy and there is no evidence of bad faith on the state's part. In a trial of this complexity and notoriety, some error by both sides is unavoidable.

The critical weakness in Mastrian's argument is his inability to identify with some specificity the ways in which his case was prejudiced by the alleged errors. In this instance, Mastrian's general allegations of prejudice do not persuade us that the errors, taken individually or collectively, substantially contributed to his conviction,

that a crucial witness's expectation of leniency must be revealed to the jury. The quoted passage says:

> Here the Government's case depended almost entirely on Taliento's testimony; * * *. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.

*Id.* at 154–155, 92 S.Ct. at 766.

While we do not dispute the force of this passage, it cannot be isolated, as Mastrian has done, from its context in the *Giglio* case. In *Giglio*, as in *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), there was no conflict as to the existence of the promise. The only question before the Court was whether the prosecutor's failure to reveal the promise to the jury was harmless. The Court renders the quoted passage as part of its harmless error discussion. The error was not harmless because of the importance of Taliento's testimony and the relevance of his credibility. It is in this context that the quoted passage must be read.

17. *State v. Mastrian, supra* at 171 N.W.2d 701.

18. *Id.* at 702.

19. *Id.* at 703.

20. *Id.* at 704.

21. *Id.* at 705.

22. Mastrian also alleged that his bail of $100,-000 was excessive, that the denial of his pretrial discovery motion was improper and that the court should have compelled production of grand jury minutes. With respect to each of these allegations, the Minnesota Supreme Court found no error was committed.

23. In *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the Supreme Court reversed a conviction in which the principal evidence of guilt was obtained after the defendant was handcuffed, taken to a hospital and forced to take an emetic solution which caused him to vomit the incriminating morphine capsules. Justice Frankfurter characterized the actions of the police as "conduct which shocks the conscience," *id.* at 172, 72 S.Ct. 205, and lacking in respect for "certain decencies of civilized conduct." *Id.* at 173, 72 S.Ct. 205. In *Fikes v. Alabama*, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957), the lengthy detention, the intermittent "horse-shedding" of the accused until a confession resulted were sufficient in combination to persuade Justice Frankfurter to concur with the majority's decision to reverse.

*Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Bear Killer,* 534 F.2d 1253 (8th Cir. 1976), and we cannot say that they sufficiently offend our notion of proper enforcement practices to require reversal.

### VI. *Conclusion.*

Numerous errors were committed during the course of Mastrian's trial. On the whole though, we are convinced that he received a fair trial by an impartial jury and that his constitutional rights were adequately protected. For the reasons stated above, we, therefore, affirm the decision of the District Court.